1  FREDRIC D. WOOCHER (SBN 96689)
   MICHAEL J. STRUMWASSER (SBN 58413)
2  BRYCE A. GEE (SBN 222700)
   STRUMWASSER & WOOCHER LLP
3  100 Wilshire Boulevard, Suite 1900
   Santa Monica, California 90401
4  Telephone:    (310) 576-1233
5  Facsimile:    (310) 319-0156
   E-mail: fwoocher@strumwooch.com
6
   J. WILLIAM YEATES (SBN 84343)
7  KEITH G. WAGNER (SBN 210042)
   JASON R. FLANDERS (SBN 238007)
8  LAW OFFICE OF J. WILLIAM YEATES
9  3400 Cottage Way, Suite K
   Sacramento, CA 95825
10 Telephone:    (916) 609-5000
   Facsimile:    (916) 609-5001
11 E-mail: byeates@enviroqualitylaw.com
12 Attorneys for Plaintiffs
   Rancho San Juan Opposition Coalition, et al.
13

14                 UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16

17
   RANCHO SAN JUAN OPPOSITION            CASE NO.  C 06-2369 JW
18 COALITION; CITIZENS FOR RESPONSIBLE
19 GROWTH; and JULIE ENGELL,             PLAINTIFFS' MEMORANDUM OF
                                         LAW IN SUPPORT OF MOTION FOR
20                          Plaintiffs,  PRELIMINARY INJUNCTION
21
22       v.
23 BOARD OF SUPERVISORS OF THE           Judge: Hon. James Ware
   COUNTY OF MONTEREY; TONY              Ctrm:  8
24 ANCHUNDO, in his capacity as MONTEREY Date:  N/A
   COUNTY REGISTRAR OF VOTERS;           Time:  N/A
25 COUNTY OF MONTEREY; and DOES 1
26 through 10, inclusive,
27
                           Defendants.
28

# CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS . . . . . . . . . . . . . . . . . . . . . . 4

    A.  THE PANEL DECISION IN *PADILLA V. LEVER* HAS FORMALLY BEEN WITHDRAWN AND IS NO LONGER GOOD LAW WITHIN THE NINTH CIRCUIT . . . . . 4

    B.  THERE IS NO PRECEDENT REQUIRING THAT REFERENDUM PETITIONS BE CIRCULATED IN MULTIPLE LANGUAGES UNDER THE VOTING RIGHTS ACT . . . . . 5

        1.  Privately Circulated Referendum Petitions Are Not "Provided" by the State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.  Privately Circulated Referendum Petitions Do Not Constitute "Voting Notices, Forms, . . . or Other Materials or Information Relating to the Electoral Process" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  THE LEGISLATIVE HISTORY OF THE VOTING RIGHTS ACT AND THIRTY YEARS OF ITS IMPLEMENTATION PROVIDE FURTHER CONFIRMATION THAT CONGRESS DID NOT INTEND SECTION 203 TO APPLY TO PRIVATELY CIRCULATED REFERENDUM PETITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    D.  THE BOARD WAS WRONG TO REMOVE THE REFERENDUM MEASURE FROM THE BALLOT, THEREBY PREVENTING AN ELECTION FROM BEING HELD ON THE REFERENDUM IN FULL COMPLIANCE WITH THE VOTING RIGHTS ACT . . . . . . . 17

II.  THE BALANCE OF HARDSHIPS WEIGHS ENTIRELY IN PLAINTIFFS' FAVOR . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

# TABLE OF AUTHORITIES

## Federal Cases

*Allen v. State Board of Elections*, 393 U.S. 544 (1969) ................................. 19

*Associated General Contractors of Calif. v. Coalition for Economic Equity,*
     950 F.2d 1401 (9th Cir. 1991) ........................................... 4

*Austin v. City of Bisbee, Arizona*, 855 F.2d 1429 (9th Cir. 1988) ................. 19

*Big Country Foods, Inc. v. Board of Education*, 868 F.2d 1085 (9th Cir. 1989) ............. 4

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir.1983) ................................. 22

*Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988),
     *cert. denied*, 492 U.S. 918 (1989) ........................... 10, 11, 12, 16, 17

*Dougherty County Board of Education v. White*, 439 U.S. 32 (1978) ............. 15

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................... 22

*Fund for Animals v. Lujan*, 962 F.2d 1391 (9th Cir.1992) .......................... 22

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
     23 F.3d 1071 (6th Cir. 1994) ........................................... 22

*George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) ............................ 19

*Gerena-Valentin v. Koch*, 523 F. Supp. 176 (S.D.N.Y. 1981) ................. 12

*Hilton v. South Carolina Public Railways Commission*, 502 U.S. 197 (1991) ............. 15

*Hoyle v. Priest*, 59 F. Supp. 2d 827 (W.D. Ark. 1999) .......................... 12

*Iowa Right to Life Committee, Inc. v. Williams*, 187 F.3d 963 (8th Cir. 1999) ............. 22

*Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988),
     *cert. denied*, 492 U.S. 921 (1989) ........................... 10, 11, 12, 17

*Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005),
     *rehearing en banc granted*, 446 F.3d 922 (Apr. 20, 2006) .................... 2, 17

*Padilla v. Lever*, 446 F.3d 922 (9th Cir. 2006) ........................... 2, 4, 5

*Presley v. Etowah County Commission*, 502 U.S. 491 (1992) ................... 16, 17

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) ..................... 17

*Sammartano v. First Judicial District Court*, 303 F.3d 959 (9th Cir. 2002) ........... 21, 22

1    *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832 (9th Cir. 2001) . . . . . . . . . 3

2    *United States v. Metropolitan Dade County, Florida,*
3        815 F. Supp. 1475 (S.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4                       **State Cases**

5    *Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal. App. 4th 123 . . . . . . . . . . 7

6    *Costa v. Superior Court* (2006) 39 Cal.Rptr.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7    *Gage v. Jordan*, 23 Cal. 2d 794 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

8    *Ley v. Dominguez* (1931) 212 Cal. 587 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9    *MHC Financing Ltd. Partnership Two v. City of Santee,*
10        125 Cal. App. 4th 1372 (Ct. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11                    **Docketed Cases**

12    *Chinchay v. Verjil*, No. 06-1637 (C.D. Cal. Apr. 11, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13    *Imperial v. Castruita*, No. 05-8940 (C.D. Cal. May 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 9

14    *In re County of Monterey Initiative Matter*, No. 06-1407 . . . . . . . . . . . . . . . . . . . . . . . . 16

15    *Padilla v. Lever*, No. 02-1145 (C.D. Cal. Feb. 25, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16                    **Federal Statutes**

17    28 C.F.R. § 55.19(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18

19    28 U.S.C.§ 1443(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20    42 U.S.C. § 1973aa-1a(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21    Fed. R. Civ. P.,

22        Rule 35(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

23        Rule 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

24    H.R. Rep. 102-655, *as reprinted in* 1992 U.S.C.C.A.N. 766 . . . . . . . . . . . . . . . . . . . . 14, 15

25    H.R. Rep. 109-478, 2006 WL 1403199 (May 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26    S. Rep. 94-295, *as reprinted in* 1975 U.S.C.C.A.N. 774 . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

27    //

28

*Rancho San Juan Opposition Coalition et al. v. Board of Supervisors et al.*
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-2369 JW

## State Constitutions and Statutes

Cal. Const., art. II, § 9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cal. Elec. Code,

       § 1410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       § 8101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       § 9141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

       § 9144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

       § 9145 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 12, 20

       §§ 9146-9147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       § 9605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18

       § 10227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Colo. Rev. Stat. § 1-40-105(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fla. Stat. § 16.061(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rancho San Juan Opposition Coalition et al. v. Board of Supervisors et al.*
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-2369 JW

On November 7, 2005, the Monterey County Board of Supervisors passed Resolution No. 05-305, which sought to amend certain provisions of the Monterey County General Plan, the Greater Salinas Area Land Use Plan, and the Rancho San Juan Area of Development Concentration Development Guidelines and Principles, in order to allow the wide-scale development of a new 671-acre golf-residential subdivision. Verified Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief ("Complaint"), ¶¶ 11-12. In the view of many Monterey County residents, this proposed development, among other ills, threatens to significantly exacerbate housing, traffic, water quality, and water supply problems, to reduce the service capabilities of local police, fire, and other agencies, and to undermine the local economy.

Exercising their constitutionally protected right to challenge the adoption of such resolutions through the referendum process, Plaintiffs Rancho San Juan Opposition Coalition, Citizens for Responsible Growth, and Julie Engell immediately began circulating the Referendum Against Resolution No. 05-305 (the "Referendum"). Under California law, legislative enactments (with the exception of those enacted on an urgency basis) do not take effect until 30 days after their adoption. *See, e.g.,* Cal. Elec. Code, § 9141. If, during this 30-day period, a petition signed by county voters equal in number to at least 10% of the votes cast for Governor at the last gubernatorial election protesting the adoption of an ordinance or resolution is filed with the county, the enactment is suspended and must be reconsidered by the legislative body. *Id.*, § 9144. If the Board of Supervisors does not then repeal the ordinance or resolution, it must be submitted to the voters at the next regularly scheduled election occurring not less than 88 days after the date of the order calling the election. *Id.*, § 9145.

In the present case, Plaintiffs filed the Referendum with the Monterey County Registrar of Voters on December 6, 2005. Complaint, ¶ 12. The petitions contained a total of 15,614 signatures, far more than the 8,697 signatures needed to qualify the Referendum for the ballot. *Id.* On January 18, 2006, the Registrar of Voters completed his verification of the signatures on the Referendum petition and certified the sufficiency of the petition to the Monterey County Board of Supervisors. *Id.*, ¶ 13. At its next regularly scheduled meeting, on January 24, 2006, the Board of

1

Supervisors ordered that the Referendum measure, which would be denominated "Measure C," be placed on the June 6, 2006, ballot, as required by Elections Code section 9145. *Id.*, ¶ 14 & Exh. B (Resolution No. 06-027, "calling for an election on June 6, 2006 to submit to the voters of Monterey County the question of whether or not to approve Resolution No. 05-305 . . ."). A formal notice of the June 6, 2006, election on the Referendum was issued that same date. *See id.*, Exh. C.

On March 28, 2006, however — with the scheduled election just 70 days away — the Board of Supervisors abruptly withdrew the Referendum measure from the June ballot. Citing the Ninth Circuit's decision in *Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005), *rehearing en banc granted*, 446 F.3d 922 (Apr. 20, 2006), *and opinion withdrawn*, 446 F.3d 963 (Apr. 28, 2006), which held that recall petitions must be circulated in multiple languages under the federal Voting Rights Act ("VRA"), the Board suddenly expressed concerns that the Referendum petitions — which were printed and circulated only in English — might likewise violate the VRA. *Id.*, ¶ 15.

Plaintiffs Rancho San Juan Opposition Coalition et al. immediately filed suit in Monterey County Superior Court (Case No. M78760) challenging the Board of Supervisors' withdrawal of the certified Referendum from the June ballot, contending that the Board violated its ministerial duty under Elections Code section 9145 either to repeal Resolution No. 05-305 or to submit it to a vote of the people at the next regularly scheduled election, and that the Board violated Elections Code section 9605, which requires "notwithstanding any other provision of law . . . that a measure or proposal [to] be submitted to the voters of any jurisdiction . . . shall not be amended or withdrawn after the 83rd day prior to the election." Complaint, ¶¶ 16-20. On April 3, 2006, the Monterey County Defendants filed a Notice of Removal pursuant to 28 U.S.C. section 1443(2), asserting that "[o]ne of the primary reasons that Defendants declined to place this measure on the ballot was because, based upon a recent decision of the Ninth Circuit in *Padilla v. Lever*, 429 F3d 910 (2005), the manner in which the Referendum proponents circulated the Referendum petition violates provisions of Section 203 (42 U.S.C. § 1973aa-1a) [of the] Federal Voting Rights Act of 1965 ('FVRA'), which requires that 'other materials or information relating to the electoral process' be

2

translated into Spanish in Monterey County.'" Defendants' Notice of Removal, p. 2, ¶ 4.[1]

Given the timing of the Board of Supervisors' action in suddenly removing the Referendum from the June 2006 ballot just weeks before the election, it was too late for Plaintiffs to obtain any effective judicial relief relating to that election. Plaintiffs now bring the instant motion for preliminary injunction, however, to compel the Board of Supervisors to submit the qualified Referendum to a vote of the people at the next regularly scheduled countywide election in November 2006. As set forth below, even when the panel's opinion in *Padilla v. Lever* was in effect, the Board had no legal justification for invalidating the Referendum petitions under the Voting Rights Act and removing the Referendum from the ballot. But now that the panel's opinion has been withdrawn and is no longer good law, there is ***absolutely no case law or other authority*** that justifies invalidating the Referendum petitions in this case. To the contrary, all of the remaining precedent — both within and without the Ninth Circuit — holds that citizen-sponsored and privately-circulated initiative and referendum petitions are ***not*** subject to Section 203's multilingual requirements. The requested preliminary injunction must therefore be granted, preserving Monterey County citizens' exercise of their constitutional right to petition their government and reinstating the qualified Referendum measure on the November 7, 2006, ballot.

## ARGUMENT

The standards for obtaining injunctive relief under Rule 65 of the Federal Rules of Civil Procedure are well-established in this Circuit. A request for injunctive relief should be granted if the moving party establishes either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839-40 (9th Cir. 2001). These formulations are not "different tests, but represent two

---

[1] Although the present case was originally assigned to Judge Fogel, it was subsequently ordered related to the case entitled *Rangel et al. v. County of Monterey et al.* (No. C 06-02202 JW RS) and assigned to this Court. In *Rangel*, the plaintiffs seek declaratory and injunctive relief to compel the County of Monterey "to ensure that referendum petitions, and all textual requirements relating to the referendum process, are printed and circulated in Spanish, a designated minority language, as well as in English, because the County is required to provide bilingual voting materials pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.,* as amended." *Rangel* Complaint, ¶ 2.

3

points on a sliding scale in which the degree of irreparable harm increases as likelihood of success on the merits decreases." *Associated Gen. Contractors of Calif. v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991), *quoting Big Country Foods, Inc. v. Board of Education*, 868 F.2d 1085, 1088 (9th Cir. 1989). As discussed below, Plaintiffs readily satisfy the standards for injunctive relief pursuant to Rule 65.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

It is undisputed that the Referendum Against Resolution No. 05-305 fully complied with all procedural requirements of the California Elections Code, that it was certified by the Monterey County Registrar of Voters as having been signed by the requisite number of registered voters, and, indeed, that it was deemed qualified by the County Board of Supervisors back in January 2006 and was ordered to be placed on the June 6, 2006, statewide primary election ballot. Nevertheless, barely two months before the measure was scheduled to be voted on, Defendant Board of Supervisors suddenly reversed course and ordered that the Referendum be removed from the June ballot, assertedly on the ground that under *Padilla v. Lever*, the measure violates Section 203 of VRA because the Referendum petitions that Plaintiffs circulated among the County's voters had not been translated into Spanish. Notice of Removal, ¶ 4. Defendants' position was not well-taken even when the panel opinion in *Padilla* was "good law" within the Ninth Circuit, but is completely without merit now that the panel's opinion has been ordered withdrawn by the en banc court. In the absence of the panel's decision in *Padilla*, there is *no authority whatsoever* that supports the Board's refusal to submit the Referendum to a vote of the people.

### A.   THE PANEL DECISION IN *PADILLA V. LEVER* HAS FORMALLY BEEN WITHDRAWN AND IS NO LONGER GOOD LAW WITHIN THE NINTH CIRCUIT

In *Padilla v. Lever*, a divided panel of the Ninth Circuit held that *recall petitions* must be circulated in multiple languages under Section 203 of the VRA. But the Ninth Circuit has now *twice* declared that this decision is not to be relied upon and is *no longer good law*. On April 20, 2006, the full Ninth Circuit granted rehearing en banc of the three-judge panel's two-to-one decision, ordering that the opinion "shall not be cited as precedent by or to this court *or any district court of the Ninth Circuit*, except to the extent adopted by the en banc court." *Padilla v. Lever*, 446 F.3d 922

4

(9th Cir. 2006) (emphasis added). The full court's grant of rehearing en banc is, of course, an exceptional step in itself, signaling the Ninth Circuit's serious doubts over the correctness and appropriateness of the panel's decision. *See* Fed. R. Civ. P. 35(a) ("An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance.").

Barely a week later, on April 28, 2006, the Ninth Circuit made its evident disapproval of the panel's decision in *Padilla* even more explicit. On that date, the en banc court itself — that is, the fifteen Ninth Circuit judges who are actually rehearing the *Padilla* appeal en banc — took the additional, and virtually unprecedented, step of issuing an order to "withdraw the opinion of the three judge panel." *Padilla v. Lever*, 446 F.3d 963 (9th Cir. 2006). The en banc court thus indicated that it would definitely *not* be adopting the panel's opinion as the opinion of the full court. Beyond that, however, the en banc court's extraordinary order appears to have been intended to send an unmistakable message to district courts, litigants, and recall, initiative, and referendum proponents throughout California that the decision of the three-judge panel in *Padilla is no longer good law and should not be relied upon within the Ninth Circuit* pending the issuance of the full court's decision in the case.

With the Ninth Circuit's withdrawal of the panel's decision in *Padilla*, the entire asserted basis for Defendants' withdrawal of the Referendum measure from the ballot has been removed, for there is now *no judicial precedent from anywhere in the country* supporting Defendants' contention that Plaintiffs' failure to translate their Referendum petitions into multiple languages requires the disqualification of the Referendum. To the contrary, *all of the pertinent authority* — as well as the consistent administrative practice in California and throughout the country — confirms that privately circulated referendum petitions are *not subject* to Section 203's multilingual requirements.

**B.     THERE IS NO PRECEDENT REQUIRING THAT REFERENDUM PETITIONS BE CIRCULATED IN MULTIPLE LANGUAGES UNDER THE VOTING RIGHTS ACT**

There was, of course, very good reason for the Ninth Circuit to withdraw the panel opinion in *Padilla*. That decision squarely conflicted with rulings of both the Tenth and Eleventh Circuit

5

Courts of Appeals, as well as with the statutory language of Section 203, its legislative history, and the consistent interpretation given to the Voting Rights Act by the Department of Justice and elections officials throughout the country. ***Simply put, in the 30 years since the enactment of Section 203, no elections official or court anywhere in the country has ever before required that privately circulated referendum petitions must be translated into and printed in multiple languages under the VRA.***

By the plain terms of the statute, Section 203(c) of the VRA does not apply to citizen-sponsored initiative and referendum petitions that are privately drafted and circulated. Section 203 provides in pertinent part:

> "***Whenever any State or political subdivision*** subject to the prohibition of subsection (b) of this section ***provides*** any registration or voting notices, forms, instructions, assistance, or other ***materials or information relating to the electoral process***, including ballots, ***it shall provide them*** in the language of the applicable minority group as well as in the English language . . . ." 42 U.S.C. § 1973aa-1a(c) (emphasis added).

Thus, the VRA's multilingual provisions apply only where: (1) the State or a political subdivision "provides" voting notices or other specified materials or information; and (2) those materials "relat[e] to the electoral process." Privately circulated referendum petitions satisfy neither condition.

### 1. Privately Circulated Referendum Petitions Are Not "Provided" by the State

By no stretch of the imagination (or the statutory language) could anyone consider the state to "provide" referendum petitions. Indeed, by its very nature, the referendum in California is a power that is reserved to and is exercised exclusively by ***the people***, not the State. Article II, section 9(a), of the California Constitution proclaims: "The referendum is the power *of the electors to approve or reject statutes or parts of statutes* . . . ." (Emphasis added.) Referendum petitions thus constitute the very ***antithesis*** of State-provided materials or information: They are the ***private citizens'*** means of ***protesting*** State or government action. For this very reason, the role of the State

6

and its elections officials in the referendum petitioning process is limited to the purely *ministerial* functions of ensuring that a privately initiated and circulated petition complies with the *procedural* requirements of the Elections Code regarding its format and contents. *See generally Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 125 (elections officials are foreclosed from making "decisions that are discretionary or go beyond a straightforward comparison of the submitted petition with the statutory requirements for petitions"); *Ley v. Dominguez* (1931) 212 Cal. 587, 602 ("duties and powers of the city clerk in reference to his examination of referendum petitions . . . are purely ministerial and not judicial").

Even before the *Padilla* panel opinion was withdrawn, U.S. District Court Judge Audrey B. Collins of the Central District of California addressed the very issue presented by the instant case and concluded that referendum petitions — in contrast to recall or initiative petitions — are *not* subject to Section 203 of the VRA because they are not "provided" by the state or a political subdivision. In *Chinchay v. Verjil*, No. 06-1637 (C.D. Cal. Apr. 11, 2006), Judge Collins refused to issue a preliminary injunction prohibiting two referenda from being submitted to the voters of the City of Loma Linda — a covered jurisdiction under Section 203 of the VRA — because they were not circulated in Spanish, as well as English. (A copy of Judge Collins' Order Re: Plaintiffs' Motion for Preliminary Injunction in *Chincay* is attached as Exhibit A to the accompanying Declaration of Fredric D. Woocher ("Woocher Decl.").) Upon reviewing California's statutory provisions for circulating and qualifying a referendum — under which state officials merely confirm that the minimal procedural requirements regarding the *form* of the petition have been met and never even *see* the petition until *after* it has been signed by the voters and submitted for filing (*see generally* Cal. Elec. Code, §§ 9146-9147) — Judge Collins found that "aside from generally regulating the format, *the state is not involved in any way with referendum petitions* prior to their circulation for signature, in contrast to both recall and initiative petitions." Woocher Decl., Exh. A, at pp. 15-16 (emphasis added). As the court concluded, "Thus a given referendum petition is neither submitted to, reviewed by nor supplemented in any way by the state until *after* it has been circulated and all signatures have been collected, instead remaining until that time 'wholly created and controlled by private parties.' *Padilla*, 429 F.3d at 923. To expand the application of the state-'provided' electoral

7

1   process to referenda would be to 'strain[] the meaning of these statutory terms' beyond what this
2   Court deems to be Congress's, or the Ninth Circuit's, intent. *Id.* at 926 (Canby, J., dissenting)."
3   Woocher Decl., Exh. A, at p. 16 (emphasis in original).

4       Judge Collins additionally found that "the wholesale application of the Ninth Circuit's
5   reasoning in *Padilla* to referenda is also problematic due to two important differences between
6   referenda and initiatives or recalls — namely, the thirty day time limit and the often lengthy materials
7   that must be included with a referendum petition." *Id.* Requiring referendum petitions to be
8   translated into languages other than English, the court held, would effectively nullify the right of
9   referendum, which could not have been what Congress intended in enacting Section 203:

10      "[W]hile the Ninth Circuit has stressed the importance of broadly construing the
11      remedial terms of the VRA, an equally crucial point is that such a broad construction
12      need only be undertaken to the extent that it achieves the purpose of maximizing
13      participation in the electoral process. Requiring referenda to comply with the
14      bilingual provisions of the VRA, however, exceeds the purpose of such construction,
15      and may in fact erode such purpose and restrict participation. To require a
16      referendum proponent to translate an entire referendum petition, which in this case
17      amounts to approximately 350 pages, into one or even several other languages, and
18      then obtain the requisite number of signatures, all within the thirty day time limit, is
19      *a nearly insurmountable task*. In addition, the economic costs would be
20      considerable, depending on the number of languages at issue and, more to the point,
21      would be borne by the citizen-proponents, not local governments. *The result of*
22      *imposing such a requirement would effectively nullify the right of citizens in this state*
23      *to engage in the referendum process, which cannot be what Congress intended in*
24      *enacting the VRA.*" *Id.*, Exh. A, at pp. 16-17 (emphasis added).

25      Although Judge Collins thus refused to issue a preliminary injunction prohibiting the City
26  of Loma Linda from placing the two *referenda* on the ballot, she nevertheless did issue an injunction
27  prohibiting the city from submitting a proposed *initiative* measure to the voters, finding that "the
28  nature and extent of state involvement in the initiative process is similar enough to the recall process

8

to bring initiatives within the VRA, under the rationale set forth in *Padilla*." Woocher Decl., Exh. A, at p. 14. Last month, however, after the Ninth Circuit withdrew the panel's opinion in *Padilla*, Judge Collins granted a motion for reconsideration and ***vacated*** the preliminary injunction with respect to the initiative, as well, clearing the way for the measure to appear on the November ballot. As Judge Collins explained in her order granting reconsideration:

> "This Court's prior decision to apply the VRA to initiative petitions was based entirely upon the Ninth Circuit's holding in *Padilla* regarding the scope of the VRA. In fact, as the Court discussed in its prior Order and as Intervenors point out, no other decision by *any* Court of Appeals has applied Section 203 of the VRA to citizen-sponsored measures such as recall, initiative and referendum petitions. *See Delgado v. Smith*, 861 F.2d 1489, 1497 (11th Cir. 1988) (holding that the bilingual provisions of the VRA do not apply to the initiative process); *Montero v. Meyer*, 861 F.2d 603, 607 (10th Cir. 1988) (same). As such, upon the withdrawal by the Ninth Circuit of the *Padilla* opinion, the Court finds that Plaintiffs can no longer show a likelihood of success on the merits, and thus the preliminary injunction cannot stand. Further, although Plaintiffs argue that the balance of hardships tips in their favor, the Court finds that preserving the preliminary injunction until after the Ninth Circuit's rehearing of *Padilla* would work an unjustifiable hardship on the Intervenors. In particular, in order for the initiative to qualify for the November ballot, the City Council must order that the measure be placed on the ballot no later than August 11, 2006. *See* Cal. Elec. Code § 1405(a). By contrast, if the Ninth Circuit were to affirm its prior decision in *Padilla*, the initiative could be removed from the ballot at any time before the election." Order Re: Defendants-in-Intervention's Motion for Reconsideration and Motion to Dismiss, attached to Woocher Decl., Exh. B, pp. 25-26 (emphasis in original).[2]

---

[2]Following the Ninth Circuit's withdrawal of the panel opinion in *Padilla*, U.S. District Judge R. Gary Klausner of the Central District similarly reconsidered and ***reversed*** his prior holding that Section 203 of the VRA applied to recall petitions, thereby permitting the previously-enjoined recall election in the City of Rosemead to go forward. *See Imperial v. Castruita*, No. 05-8940 (C.D. Cal.

9

Judge Collins, of course, is absolutely correct that there are no Court of Appeals decisions (or any other authorities) supporting the Monterey County Board of Supervisors' contention that privately circulated initiative or referendum petitions must be translated into and circulated in Spanish in order to comply with Section 203's multilingual provisions. In fact, as Judge Collins noted, the only two Court of Appeals decisions that have addressed this issue have come to the *opposite conclusion*: that initiative petitions drafted and circulated by private citizens are ***not subject*** to the VRA's multilingual translation requirements. *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988), *cert. denied*, 492 U.S. 921 (1989); *Delgado v. Smith*, 861 F.2d 1489 (11th Cir. 1988), *cert. denied*, 492 U.S. 918 (1989). Those Courts of Appeals both held that the State could not be considered to "provide" a petition merely because — as is the case in California, as well — the State regulates the petition's format and charges elections officials with the ministerial duty to certify a petition's compliance with the statutory requirements regarding its permissible form and contents. *See Montero*, 861 F.2d at 610 ("The acts performed by those officers are designed primarily to make the initiative process fair and impartial, and do not constitute providing the petitions to the electorate."); *Delgado*, 861 F.2d at 1496 ("the Florida Secretary of State is charged with limited ministerial duties regarding the initiative process . . . . [T]hese duties do not constitute state formulation of the initiative petition."). As the Court of Appeals explained in *Delgado*:

> "No state action link exists between the proponents of the English language petition and the state statutory scheme. The state does not initiate the petition, does not draft the language of the petition, does not address the merits of the proposal and does not participate in any way in the circulation of the petition or in the collection of signatures. Rather, all of this action is taken by private citizens. The state's responsibility is to ensure that the petition meets the requirements of law and will fairly present the proposition that may or may not be placed before the electorate. Such regulation is not sufficient to transpose such private conduct into state action."

May 24, 2006). A copy of Judge Klausner's Order Granting Defendant Nina Castruita's Ex Parte Application for Clarification of Order Granting Preliminary Injunction and Retroactively Denying Motion for Preliminary Injunction is attached as Exhibit C to the Woocher Declaration.

861 F.2d at 1497.

California's referendum process contemplates *even less involvement of state officials in the petitioning process* than the Colorado and Florida statutory schemes at issue in *Montero* and *Delgado*.[3] California elections officials do not initiate the referendum process, they do not print the referendum petitions and have no authority to approve or alter its contents, and perhaps most importantly, they do not circulate (i.e., "provide") the petition to potential signers. Indeed, as Judge Collins emphasized, elections officials in California do not even *see* a proposed referendum petition until *after* it has been circulated among and signed by the voters.

In sum, as both District Judge Collins and the Courts of Appeals in *Montero* and *Delgado* held, although state and local officials may *regulate* the petitioning process and *approve* the form of referendum petitions after they are submitted, they do not *provide* the petitions to the proponents or to prospective signers. There is simply no reasonable way to stretch Section 203(c)'s plain language to cover privately circulated referendum petitions.

> **2.    Privately Circulated Referendum Petitions Do Not Constitute "Voting Notices, Forms, . . . or Other Materials or Information Relating to the Electoral Process"**

Section 203(c) of the VRA does not apply to referendum petitions for a further reason, because they are not "materials or information relating to the electoral process." Once again, the reasoning of the Courts of Appeals in *Montero* and *Delgado* is persuasive and should be followed by this Court.

Both of these courts recognized that the "electoral process" triggered by an initiative or referendum petition does not begin until a petition is certified to contain the requisite number of signatures and the state or local governing body issues an order placing the proposed measure on the ballot for a vote of the people. Indeed, only then has it been determined *that there will even be an*

---

[3]For instance, in addition to preparing a title, submission clause, and summary of a proposed initiative prior to its circulation (*see Montero*, 861 F.2d at 610 n. 5), Colorado officials also review the text of the proposed measure and provide comments and "suggested editorial changes" to the proponents. *See* Colo. Rev. Stat. § 1-40-105(1). Similarly, every initiative petition in Florida, in addition to having its form and style reviewed by elections officials for compliance with statutory requirements, must also be submitted to the state Supreme Court for an advisory opinion on whether it conforms to Florida law. *See* Fla. Stat. § 16.061(1); *Delgado*, 861 F.2d at 1491. California law has no analogous requirements for referendum petitions.

11

election. Under California's constitutional and statutory scheme, there are two phases in the referendum process: In the first phase, the referendum *proponents* have the right to gather signatures on a petition *protesting* the adoption of a particular legislative enactment; in the second phase, assuming the petition has enough signatures to qualify for the ballot, all *voters* have the right to *vote* on whether the measure should be enacted. Only the second phase can legitimately be deemed to constitute the "electoral" process, and it is only during this second phase that the requirements of Section 203(c) would apply.[4]

In fact, when a local governing body receives a certified referendum petition, it must first decide whether to repeal the challenged measure itself, or whether to place the issue on the ballot for a vote of the people. *See, e.g.*, Cal. Elec. Code, § 9145. It is not necessarily uncommon for the legislative body to choose the first option, in which case *there will never be an election* in response to the referendum petition. Such a result only highlights the point that the actual "electoral process" does not begin until the circulated petitions have been certified as sufficient and an election is called on the proposed measure. Only at that point does the electorate become entitled to *vote* on anything, and only at that point are the protections of the VRA for language minorities triggered. As the Court of Appeals in *Delgado* thus concluded, "the petition process [is] far too removed from the voting booth to fall under the [VRA]." 861 F.2d at 1493; *accord, Montero*, 861 F.2d at 607 (the "electoral process" does not commence until a "measure is qualified for placement upon the ballot, and . . . signing of an initiated petition is not 'voting.'").[5]

---

[4]Critically, no voter — whether English-speaking or Spanish-speaking — has any "right" to be shown or to sign a referendum petition. The proponents of a particular referendum have complete discretion regarding how and where they choose to circulate their petition and whom they may ask to sign it; if they want to, a referendum's proponents can even cross off the names of all Latino-surnamed voters before submitting the petitions for verification, or they can unilaterally decide to abandon the referendum effort before submitting any signatures — whether or not they had gathered a sufficient number to qualify the measure for the ballot. That the referendum proponents maintain such complete control over the petitions prior to the moment they are submitted to the elections official underscores the distinction between the very private *petitioning* process and the public *electoral* process, in which every voter is entitled to participate on an equal basis.

[5]Two other district courts have likewise held that privately circulated petitions are not "voting" or "election" materials, and therefore are not subject to the VRA. *See Hoyle v. Priest*, 59 F.Supp.2d 827, 834 (W.D. Ark. 1999) ("signing an initiative petition is not tantamount to voting in an election" and "does not fall within the purview of the Voting Rights Act"); *Gerena-Valentin v. Koch*, 523 F.Supp. 176, 177 (S.D.N.Y. 1981) ("The failure to provide bilingual petitions does not

12

C.   **THE LEGISLATIVE HISTORY OF THE VOTING RIGHTS ACT AND THIRTY YEARS OF ITS IMPLEMENTATION PROVIDE FURTHER CONFIRMATION THAT CONGRESS DID NOT INTEND SECTION 203 TO APPLY TO PRIVATELY CIRCULATED REFERENDUM PETITIONS**

If the plain language of Section 203 and the construction given to that language by every court to address the issue were not enough, the legislative history of the Voting Rights Act and the manner in which it has been implemented during the 30 years since the language minority provisions were added in 1975 provide yet further confirmation that privately circulated initiative and referenda petitions are not required to be translated into multiple languages under the Act.

The legislative history of the VRA makes clear that in enacting Section 203, Congress was concerned only with "elections" and "voting," and not with the private petitioning process. It was, after all, the concern that "English-only *elections*" excluded language minority citizens from the electoral process that prompted Congress in 1975 to enact Section 203, which Congress anticipated would "[s]uspend[] English-only *elections* and mandat[e] bilingual ones for a ten year period." *See* S. Rep. 94-295, at 28, *as reprinted in* 1975 U.S.C.C.A.N. 774, 794; S. Rep. 94-295, at 34 (emphasis added). Congress hoped that this requirement would counteract some of the "barriers to *voting* which language minority citizens face," such as "underrepresentation of minority persons as *poll workers*; unavailability or inadequacy of assistance to illiterate voters; lack of bilingual materials *at the polls* for these non-English speaking persons; and problems with the use of absentee *ballots*." *Id.* at 26 (emphasis added).

Congress did not express any similar concern about English-only referendum (or initiative) petitions; these petitions were not even mentioned anywhere in the extensive hearings on this legislation. In fact, the legislative history reflects a clear congressional intention *not* to include such privately circulated petitions within Section 203's coverage, because Congress envisioned that this requirement would only be "applicable to *states and political subdivisions.*" *Id.* at 9 (emphasis

by itself deprive the Hispanic community of their right to vote."). Indeed, for similar reasons, the District Court in *Padilla v. Lever*, No. 02-1145 (C.D. Cal. Feb. 25, 2003) held that *recall* petitions are not subject to Section 203(c)'s multilingual requirements because they are not materials relating to the "electoral process." (A copy of Judge Alice Marie Stotler's order granting Defendant's Motion to Dismiss the VRA claim in *Padilla* is attached as Exhibit D to the Woocher Declaration.)

added). As the Committee Report summarized the statute's impact: "For a period of 10 years, *state and local officials* are prohibited from providing English-only registration and election materials if (i) more than five percent of citizens of voting age in the jurisdiction are of a single language minority and (ii) the illiteracy rate of the language minority group citizens is higher than the national illiteracy rate for all persons of voting age." *Id.* at 48.

Notably, every reference to Section 203's multilingual requirement in the legislative history makes clear that the requirement was to apply only to materials provided by the state or a political subdivision. *See, e.g., id.* at 30 ("The failure of *states and local jurisdictions* to provide adequate bilingual registration and election materials and assistance undermines the voting rights of non-English speaking citizens and effectively excludes otherwise qualified voters from participating in elections.") (emphasis added); *id.* at 39 ("*states and local jurisdictions* have been disturbingly unresponsive to the problems of [language] minorities.") (emphasis added). Moreover, when Congress considered the logistical costs of requiring bilingual or multilingual elections, it only investigated those costs that would be incurred by states and political subdivisions. *Cf. id.* ("The Committee has taken pains to insure that [the bilingual elections requirement] will be implemented effectively with minimal cost to the *states and political subdivisions* involved.") (emphasis added). Among other things, the "Subcommittee sent letters to elections officials in all areas to be covered by Title III" to inquire about the fiscal feasibility of requiring bilingual or multilingual translations, and Congress was satisfied because "the great majority responded that the cost was not prohibitive." *Id.* Because it had no intention of requiring that private citizens comply with this requirement, Congress did not likewise examine the costs that they would incur in circulating referendum (or initiative) petitions in multiple languages.

Finally, perhaps as significant as what Congress *did say* about its intent in originally enacting Section 203 is what it *did not say* or do thereafter. After Section 203 was first enacted in 1975, Congress twice reauthorized the VRA to extend the language minority section's duration and to modify certain of its provisions. In the most recent amendment in 1992, Congress again emphasized that Section 203 was primarily focused on requiring multilingual *elections*. *See, e.g.,* H.R. Rep. 102-655, at 3, *as reprinted in* 1992 U.S.C.C.A.N. 766, 767 ("In several States, English-only laws may

14

prevent the use of any type of official bilingual *ballot* if § 203 were not reauthorized.") (emphasis added); *see also id.* at 5 ("it is necessary to eliminate such discrimination by prohibiting English-only *elections*") (emphasis added).  Equally if not more significantly for present purposes, the 1992 amendment left Section 203(c)'s language untouched in the face of the *Montero* and *Delgado* rulings that had interpreted Section 203 *not to apply* to privately circulated initiative petitions.  Congress' acquiescence in those judicial decisions as well as in the uniform practice of states and local jurisdictions to permit private citizens to circulate recall, initiative, and referendum petitions only in English evinces its tacit agreement that these privately circulated petitions are not covered by Section 203.  *See Dougherty County Board of Education v. White,* 439 U.S. 32, 38 (1978) ("Had Congress disagreed with [the courts'] broad construction of § 5, it presumably would have clarified its intent when re-enacting the statute in 1970 and 1975."); *Hilton v. South Carolina Pub. Railways Comm'n*, 502 U.S. 197, 202 (1991) (Congress' failure to correct a prior decision of the Court when it had the opportunity to do so should be interpreted  as congressional "acceptance of our earlier holding," particularly "when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response.").[6]

---

[6]As this Court is probably aware, the Voting Rights Act is once again up for reauthorization, and this time, Congress's intent that privately circulated petitions are *not* covered by Section 203's multilingual requirements has been made *explicit*.  As the House Judiciary Committee's May 22, 2006, Report regarding the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 explains:

> "[L]anguage assistance that facilitates equal participation in the voting process so language minority citizens are able to cast effective ballots *does not require private citizens to make privately prepared and distributed materials available in the covered languages.*  In recognizing the exclusion of petitions that are initiated and distributed by private citizens from Section 203's requirements, the Committee restates its position that Section 203 is intended to remedy the 'denial of the right to vote of such minority group citizens . . . [that is] directly related to the unequal educational opportunities afforded them, resulting in high illiteracy and low voting participation.'  *To impose Section 203's requirements on private citizens whose actions are outside governmentally administered voting systems would have the effect of penalizing private citizens for injuries caused by States.*  Section 203's assistance is a remedy for the past and present failures of States and jurisdictions to remedy educational disparities, putting language minority citizens on an equal footing in exercising the right to vote." H.R. Rep. 109-478, at 59, 2006 WL 1403199 (May 22, 2006) (emphasis added; full Report is also available online at <http://judiciary.house.gov/media/pdfs/109-478.pdf>).

15

1  This Court must therefore accord the *Montero* and *Delgado* decisions substantial deference,
2  not just because Congress has implicitly approved their holdings, but also because states and local
3  governments throughout the country have relied upon those decisions to permit private initiative and
4  referendum petitions to be circulated only in English. As the Court in *Delgado* concluded,
5  "Congress has never shown any intent, either in the text of its legislation or in the legislative history,
6  to expand coverage of the Act to materials distributed by private citizens. While undertaking such
7  an expansion in the law might be within the power of Congress under the Fifteenth Amendment, it
8  is an inappropriate step for us to take." 861 F.2d at 1493.[7]

9

10  [7]In arguing to this Court that initiative petitions were subject to Section 203 of the VRA in *In re County of Monterey Initiative Matter,* No. 06-1407, Defendants suggested that the inclusion
11  of the word "petition" in the Attorney General's "interpretative guidelines" for implementing Section 203(c) supports a conclusion that *all* petitions, even those drafted and circulated by private
12  parties, should be held to be covered by the Act. Those guidelines provide:

13  "It is the obligation of the jurisdiction to decide what materials must be provided in a minority language. A jurisdiction required to provide minority
14  language materials is only required to publish in the language of the applicable language minority group materials distributed to or provided for the use of the
15  electorate generally. Such materials include, for example, ballots, sample ballots, informational materials, and *petitions*." 28 C.F.R. § 55.19(a) (emphasis added).

16  To begin with, it is unclear as to exactly what type of "petitions" the regulation is referring.
17  The initial sentences of the regulation reflect the Attorney General's understanding that it is the *jurisdiction* — not the private citizens — that is "required to provide minority language materials."
18  Therefore, the types of "petitions" that must be translated into minority languages are only those that a jurisdiction provides, such as *nominating petitions*, which — in stark contrast to initiative or
19  referendum petitions — are indeed "provided" by the state to candidates. *See, e.g.,* Cal. Elec. Code, § 8101 ("All forms required for nomination and election to all congressional, state, county, and
20  political party county central committee offices shall be furnished only by the county elections official."); *id.* § 10227 (parallel provision for municipal offices).

21  More importantly, the Attorney General's actual *actions* in this regard speak much more
22  loudly than the text of the cited regulation. In the more than 30 years since Section 203 was enacted, the Department of Justice has brought dozens of cases enforcing the language minority provisions
23  of the VRA, but *it has never once challenged the circulation of an initiative or referendum petition in English only. See, e.g.,* <http://www.usdoj.gov/crt/voting/litigation/recent203.htm>
24  (listing recent VRA cases filed by DOJ's Voting Section). The Attorney General's failure to interpose an objection to these petitions is surely powerful evidence that the Attorney General does
25  not in fact take the position that such petitions are covered by Section 203 of the VRA.

26  In any event, the Attorney General's construction of the VRA is not binding, and as the Supreme Court emphasized in *Presley v. Etowah County Commission,* 502 U.S. 491 (1992), it is
27  entitled to deference only to the extent that it is consistent with the text of the statute and Congressional intent. "Deference does not mean acquiescence. As in other contexts in which we
28  defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable."

16

**D.** **THE BOARD WAS WRONG TO REMOVE THE REFERENDUM MEASURE FROM THE BALLOT, THEREBY PREVENTING AN ELECTION FROM BEING HELD ON THE REFERENDUM IN FULL COMPLIANCE WITH THE VOTING RIGHTS ACT**

Even if this Court were somehow to agree with Defendants as a matter of first impression that referendum petitions should be translated into multiple languages under Section 203(c) of the VRA, such a determination does not justify the Board of Supervisors' action in belatedly withdrawing the Referendum from the ballot and preventing the citizens of Monterey County from ever voting on the challenged Resolution. The Board's decision to remove the Referendum measure was a drastic step that was neither required by the VRA nor warranted by the circumstances in this case.

In the *Padilla* case itself, for instance, even though the panel opinion had concluded that recall petitions were subject to Section 203, *the recall election was allowed to proceed*. *See* 429 F.3d at 914 n.4. As was the case with the Santa Ana Unified School District recall election at issue in *Padilla*, the actual election on the instant Referendum in Monterey County will be conducted *in full compliance with the Voting Rights Act*. Ballots and sample ballots will be provided in multiple languages by the County, and voting and registration assistance will be available to members of language minorities who are not sufficiently proficient in English. Nobody will be denied the right to participate fully and effectively in the election due to his or her limited ability to speak English. As a result, no *future* violation of the Voting Rights Act would be prevented by prohibiting the Referendum from being submitted to the voters at the November 2006 election.

Moreover, it is significant in this case that Plaintiffs had drafted and circulated their Referendum petitions before *any court* — even the now-discredited panel majority in *Padilla* — had ever held that any privately circulated petitions were required to be printed in any languages other than English. Plaintiffs began to circulate their Referendum almost immediately after Resolution No. 05-305 was enacted by the Board of Supervisors on November 7, 2005. The panel opinion in

---

*Id.* at 508; *accord, Reno v. Bossier Parish School Board*, 520 U.S. 471, 483 (1997). As the Courts of Appeals in *Montero* and *Delgado* both held, interpreting Section 203 to apply to initiative and referendum petitions — if that were what the Attorney General in fact intended — would "result in a construction of [the] statute beyond its limits," and such an interpretation must therefore be rejected. *Montero*, 861 F.2d at 609; *accord, Delgado*, 861 F.2d at 1494.

1    *Padilla* was not issued until November 23, 2005 (the day before Thanksgiving), and was not made
2    publicly available until the next week. At that point, Plaintiffs had only eight days left to obtain the
3    nearly 9,000 signatures on their petition and to file it with the County Registrar of Voters. As Judge
4    Collins recognized, it would have been an "insurmountable task" to translate the lengthy Referendum
5    petition into Spanish under these circumstances. And to what purpose? Certainly, the petitions
6    would not have been signed by *fewer voters* if they had also been translated into Spanish. No claim
7    has been made that anyone signed the petitions in error, or that there is any other reason the
8    Referendum might not have qualified for the ballot if the petitions had been circulated in Spanish
9    as well as English.

10          Equally significant, neither the County defendants nor the plaintiffs in *Rangel* ever voiced
11    any concern about the legality of the Referendum petitions until *months* after the petitions had been
12    submitted and the Referendum had been certified for the June ballot. To the contrary, the Board of
13    Supervisors ordered the Referendum to be placed on the June ballot in *January 2006* (almost two
14    months after the panel opinion in *Padilla*), without expressing any belief that the petitions violated
15    the Voting Rights Act and without any challenge from the *Rangel* plaintiffs. If either the Board or
16    the *Rangel* plaintiffs believed that the ***Referendum petitions*** were required to be printed and
17    circulated in Spanish under the VRA, it was incumbent upon them to challenge the validity of the
18    ***petitions*** while they were being circulated so that the purported violation could be remedied at that
19    time, not to sit by and wait until the eve of the election before suddenly claiming a violation of the
20    Voting Rights Act and seeking to prevent the holding of an election that will be conducted in full
21    compliance with the Act.[8]

22          Under these circumstances, as Judge Collins appreciated, prohibiting an election on the
23    Referendum would not ***further*** the Voting Rights Act's objective of promoting full participation in

25          [8]As noted above, by waiting until the 70th day before the election to pull the Referendum
26    from the June ballot, the Board of Supervisors also violated California Elections Code section 9605,
      which, "notwithstanding any other provision of law," prohibits a legislative body from amending or
27    withdrawing a proposed ballot measure "after the 83rd day prior to the election." In determining the
      appropriate equitable relief in this case, the Court should give effect to this provision of state law,
28    just as surely as the Court should take into account the impact of removing a measure from the ballot
      within days of an impending election.

the electoral process, but would only ***thwart*** that objective by preventing the thousands of Monterey County residents who signed the Referendum petition from participating in the electoral process and exercising "one of the most precious rights of our democratic process." *See MHC Financing Ltd. Partnership Two v. City of Santee*, 125 Cal. App. 4th 1372, 1381 (Ct. App. 2005). Unlike the case with a qualified initiative or recall petition that is subsequently declared to be invalid, the proponents of a referendum petition cannot simply "start over again" and re-circulate their petition in Spanish as well as English; once the 30-day deadline has passed, the referendum is precluded and the challenged legislative enactment becomes law, despite the citizens' objection to it.

Thus, even if this Court were to conclude — in what would clearly be the first ruling of its kind in the country — that privately circulated referendum petitions are subject to Section 203 of the VRA and must be translated into minority languages, this Court should not apply that ruling retroactively to the Referendum petition in this case so as to prohibit the measure from being voted on in the November 7, 2006, general election.[9]

## II. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFFS' FAVOR

As noted above, under the second prong of the test for issuance of preliminary injunctive relief, the Court considers whether the equities weigh in favor of or against granting the requested relief. In the present case, all of the equities support granting the preliminary injunction, for Plaintiffs face a significant threat of irreparable injury in the absence of the requested provisional relief, whereas Defendants will suffer little, if any, harm from issuance of the preliminary injunction.

Without immediate injunctive relief, Plaintiffs' Referendum — which was supposed to be

---

[9]There is ample precedent and authority for such action, both generally and specifically in fashioning relief under the Voting Rights Act. Courts will properly refuse to apply a new ruling retroactively where, as here, **(1)** the decision establishes a new principle of law; **(2)** the retroactive application of the decision will retard, not further, the purposes of the rule in question; and/or **(3)** the retroactive application of the decision will produce substantially inequitable results. *See, e.g., George v. Camacho*, 119 F.3d 1393, 1401 (9th Cir. 1997); *Austin v. City of Bisbee, Arizona*, 855 F.2d 1429, 1432-43 (9th Cir. 1988); *see also Allen v. State Board of Elections*, 393 U.S. 544, 571-72 (1969) (finding violation of Section 5 of VRA but refusing to set aside challenged elections because "[t]hese § 5 coverage questions involve complex issues of first impression — issues subject to rational disagreement"); *United States v. Metropolitan Dade County, Florida*, 815 F.Supp. 1475 (S.D. Fla. 1993) (finding that county had violated Section 203 by failing to provide voter information pamphlet in minority languages but refusing to enjoin or postpone the upcoming election because "such drastic steps are neither required nor appropriate at this juncture").

voted on at the June 6, 2006, election — will not be able to appear on the November 7, 2006, election ballot. Under California law, the statutory deadline for the Board of Supervisors to order a measure to be placed on the ballot is August 11, 2006 — 88 days before the election (*see* Cal. Elec. Code, § 1410 (election on county referendum shall occur not less than 88 days after date of the order of election) — any fairly soon thereafter it will become *physically impossible* for the Referendum to be included on the November ballot. If the Referendum is not ordered to be voted on at the November 2006 general election, the next "regularly scheduled county election" (*id.*, § 9145) will not take place for almost *two years*, in June 2008. The alternative of holding a special election on the Referendum would cost the County's taxpayers — including the Plaintiffs in this action — hundreds of thousands of dollars, and it would undoubtedly disenfranchise the many voters who typically do not turn out to vote in special elections (most especially the Spanish-speaking voters whom the VRA seeks to protect).

Any further delay of the election on Plaintiffs' qualified Referendum will cause them and the thousands of other Monterey County voters who signed the Referendum petition irreparable harm. As discussed above, the Referendum at issue here sought to challenge and force a vote on a resolution of Board of Supervisors that amended various local laws in order to authorize the development of a massive new subdivision and golf course in the Rancho San Juan area of Monterey County. Because the Referendum petition was "presented to the board of supervisors prior to the effective date of the [resolution]" and was signed by the required number of registered voters, the filing of the petition should have "suspended" Resolution No. 05-305 and prevented it from becoming "effective unless and until a majority of the voters voting on the ordinance vote in favor of it." Cal. Elec. Code §§ 9144, 9145.

However, because the Board of Supervisors has declared the Referendum petitions to be invalid and has canceled the election on the Referendum, there is now great uncertainty regarding the status of Resolution No. 05-305. The County evidently takes the position that because the Board deemed the petitions to be invalid and withdrew the Referendum from the ballot, Resolution No. 05-305 is no longer suspended and has now taken effect. Likewise, the property owner proposing the development may assert that it has obtained vested rights to develop the property in accordance with

20

the terms of Resolution No. 05-305, thereby mooting the Referendum. At a minimum, until the Referendum is submitted to a vote of the people, not only Plaintiffs and Defendants, but all of Monterey County and its citizens will remain in legal limbo as to the effectiveness of that resolution and the rights of various parties thereunder. This is precisely why courts are "ever mindful" of the "desirability of having initiative [and referendum] measures . . . reach the ballot *without delay*." *Gage v. Jordan*, 23 Cal.2d 794, 799 (1944) (emphasis added).

Earlier this year, the California Supreme Court again emphasized the courts' obligation to protect the citizens' exercise of the initiative and referendum power against unwarranted attempts to prevent a vote on a qualified measure:

> "Particularly when a preelection challenge is brought against an initiative measure
> that has been signed by the requisite number of voters to qualify it for the ballot, the
> important state interest in protecting the fundamental right of the people to propose
> statutory or constitutional changes through the initiative process requires that a court
> exercise considerable caution before intervening to remove or withhold the measure
> from an imminent election." *Costa v. Superior Court* (2006) 39 Cal.Rptr.3d 470,
> 483.

Over 15,000 Monterey County residents signed the Referendum Against Resolution No. 05-305 petitions, and tens of thousands more support the demand for a vote on the measure. If the measure is prevented from appearing on the next regularly scheduled election ballot in November, these residents and the public interest will be irreparably harmed by the denial of their First Amendment right to petition their government and by the deprivation of their right to have a meaningful say on one of the most important land-use and quality-of-life issues facing their community.

Indeed, "the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [Plaintiffs'] favor. Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First*

21

1   *Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002) (internal citations and quotations omitted);

2   *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[t]he loss of First Amendment freedoms, for

3   even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the

4   issuance of a preliminary injunction). Additionally, "[i]n cases where the public interest is involved,

5   the district court must also examine whether the public interest favors the plaintiff." *Fund for

6   Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992). "Courts considering requests for preliminary

7   injunctions have consistently recognized the significant public interest in upholding First

8   Amendment principles." *Sammartano*, 303 F.3d at 974; *see, e.g., Iowa Right to Life Committee, Inc.

9   v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (district court did not abuse its discretion in granting

10  a preliminary injunction because "the potential harm to independent expression and certainty in

11  public discussion of issues is great and the public interest favors protecting core First Amendment

12  freedoms"); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.

13  1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights");

14  *Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir.1983) (the "strong public interest in protecting First

15  Amendment values" favored preliminary injunctive relief).

16      In contrast to the significant harm that Plaintiffs will suffer if a preliminary injunction is not

17  granted, no harm will befall Defendants from the relief requested. As Judge Collins held under

18  similar circumstances in clearing the way for the challenged initiative in *Chincay v. Vergil* to appear

19  on the November ballot, if the Ninth Circuit were subsequently to issue an en banc ruling in *Padilla*

20  requiring the invalidation of the instant Referendum petition and the cancellation of the election, the

21  Referendum could be removed from the ballot up to the very date of November 7, 2006, election

22  (and even thereafter, the election results could be nullified). Moreover, even if the Court were

23  ultimately to conclude that the referendum petitions should have been printed and circulated in

24  Spanish as well as English, there will be no harm to Defendants from scheduling and holding a vote

25  on the measure, because, as discussed above, (1) nobody has ever credibly suggested that the

26  Referendum would not have qualified for the ballot if the petitions had *also* been printed in Spanish,

27  and (2) the ballots and all of the other election materials that will be provided to the voters in

28  connection with the November election *will be available* in both Spanish and English. All of the

                                    22

equities, therefore, favor granting the injunctive relief requested by Plaintiffs herein.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction and order that the Referendum Against Resolution No. 05-305 be submitted to the voters of Monterey County at the next regularly scheduled county election on November 7, 2006.


DATE: July 3, 2006                          Respectfully Submitted,

                                            STRUMWASSER & WOOCHER LLP
                                            Fredric D. Woocher
                                            Michael J. Strumwasser
                                            Bryce A. Gee

                                            LAW OFFICE OF J. WILLIAM YEATES
                                            J. William Yeates
                                            Keith G. Wagner
                                            Jason R. Flanders


                                            By _____/ s /_____
                                                   Fredric D. Woocher


                                            *Attorneys for Plaintiffs Rancho San Juan Opposition*
                                            *Coalition, Citizens for Responsible Growth, and Julie*
                                            *Engell*

23