# Exhibit E

DEC-08-2005  16:43      MO. CO. COUNSEL          831 771 8595   P.03/23
(FAX510 0084          P. 002/042

Clip

1  Mark R. Wolfe, CSB No. 176753
2  John H. Farrow, CSB No. 209221
   M. R. WOLFE & ASSOCIATES
3  49 Geary Street, Suite 200
   San Francisco, CA 94108
4  Tel: (415) 369-9400
   Fax: (415) 369-9405
5
6  Attorneys for Plaintiffs and Petitioners
7
8                THE SUPERIOR COURT OF CALIFORNIA
9  **BY FAX**         COUNTY OF MONTEREY
10                     MONTEREY COURTHOUSE
11
12  LANDWATCH MONTEREY COUNTY, a        Case No.:   **M77363**
    non-profit California Corporation, and
13  RANCHO SAN JUAN OPPOSITION
    COALITION, an unincorporated association;
14
15        Plaintiffs and Petitioners,        **PETITION FOR WRIT OF MANDATE
                                             AND COMPLAINT FOR DECLARATORY
16  vs.                                      AND INJUNCTIVE RELIEF**
17  COUNTY OF MONTEREY;                      [Code Civ. Proc. §§ 1085, 1094.5, 863;
                                             California Environmental Quality Act, Pub.
18        Defendant and Respondent           Res. Code § 21000 et seq.; State Planning and
                                             Zoning Law, Gov't Code § 65000 et seq.; SB
19                                           610, Water Code sections 10910 et seq.; SB
    H·Y·H CORPORATION, a Delaware            221, Government Code § 66473.7; Monterey
20  Corporation; and DOES I through XXV,     County Code.]
    inclusive;
21
22        Defendants and Real Parties
          In Interest
23
24
25
26
27
28

Petition for Writ of Mandate & Complaint
for Declaratory Injunctive Relief

**FILED**

DEC 07 2005

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____ DEPUTY

DEC-08-2005  16:44      MO. CO. COUNSEL                    831 771 0595    P.04/23
                        the L.. L. OAKLAND SOP
                                        (FAX)510 873-8884              P. 003/042

## INTRODUCTION

1.    This Petition and Complaint challenges the November 7, 2005 actions of Respondent COUNTY OF MONTEREY ("County") certifying an Addendum to an Environmental Impact Report ("Addendum") pursuant to the California Environmental Quality Act ("CEQA") Public Resources Code section 21000 *et seq.* and approving general plan and area plan amendments, a specific plan, and zoning changes for the revised Rancho San Juan Specific Plan/Butterfly Village Project, a 671-acre residential, commercial, and recreational project to be developed by real party in interest H-Y-H CORPORATION ("H-Y-H"). These approvals are referred to collectively herein as the "Revised Project." Petitioners and plaintiffs LANDWATCH MONTEREY COUNTY and RANCHO SAN JUAN OPPOSITION COALITION (collectively "Petitioners") allege that the County approved the Revised Project in violation of applicable provisions of: (1) CEQA; (2) the State Planning and Zoning Law, Government Code sections 65000 *et seq.*; (3) Senate Bill 610, Water Code sections 10910 *et seq.*; (4) Senate Bill 221, Government Code § 66473.7; and (5) applicable provisions of the Monterey County Code.

2.    Petitioners seek a peremptory writ of mandate under Code of Civil Procedure section 1094.5 commanding the County to set aside its certification of the Addendum and its corresponding permits and/or approvals for the Revised Project. Petitioners also seek a writ of mandate under Code of Civil Procedure section 1085 commanding the County to bring its General Plan and zoning ordinance into compliance with the requirements of the Planning and Zoning Law within 120 days, and to set aside the Revised Project-related General Plan amendments, zoning changes, and specific plan. Petitioners also seek a preliminary and permanent injunction barring the County and H-Y-H from undertaking any activity that could potentially alter the physical environment unless and until the County has taken all actions necessary to bring its actions into conformance with CEQA, the State Planning and Zoning Law, Senate Bill 610, Senate Bill 221, and the Monterey County Code. Finally, Petitioners seek a stay of the effect of the County's approval of the Revised Project during the pendency of these proceedings.

## PARTIES

### LandWatch Monterey County

3.    Petitioner LANDWATCH MONTEREY COUNTY ("LandWatch") is a California non-profit public benefit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S.

DEC-09-2005  16:44      MR. CO. COUNSEL                    831 771 0595    P.05/23
                        ...L  OAKLAND 3OP                (FAX)510 818 0084
                                                                    P. 004/042

1   Internal Revenue Code.  Its principal place of business is Salinas, California.  LandWatch's

2   organizational purpose is to promote sound land use planning and legislation at the city, county, and

3   regional levels, to combat urban sprawl, and to promote livability in the region's cities and towns,

4   through public policy development, advocacy, and education.  LandWatch is dedicated to preserving

5   economic vitality, high agricultural productivity, and environmental health in Monterey County by

6   encouraging effective public participation in the land use planning process.

7       4.    LandWatch's members, directors, and staff include residents, taxpayers, and electors in

8   Monterey County who currently enjoy the multitude of aesthetic, recreational, and health benefits

9   stemming from the current undeveloped state of the Revised Project area.  These include: clean air,

10  preserved natural resources, agricultural productivity, unobstructed views of the natural landscape,

11  hiking trails, and traffic levels significantly less than those they will experience if the Revised Project

12  proceeds.

13      5.    LandWatch's members, directors, and staff have a clear and present right to, and beneficial

14  interest in, the County's performance of its duties to comply with CEQA, the State Planning and Zoning

15  Law, Senate Bill 610, Senate Bill 221, and the Monterey County Code.  As citizens, homeowners,

16  taxpayers, and electors, LandWatch's members, directors, and staff are within the class of persons to

17  whom the County owes such duties.

18      6.    LandWatch's members, directors, and staff will also suffer direct injury as a result of the

19  Revised Project's adverse environmental, public health, aesthetic, and land use impacts.  These include:

20  the permanent loss of vast quantities of currently undeveloped open space and agricultural lands,

21  blighting of the area's landscape, air pollution associated with increased vehicle traffic from

22  construction and operation of the Revised Project, permanent loss of habitat for plant and animal species

23  including species protected under state and federal law, loss of recreational opportunities, increased

24  traffic congestion in the area, impacts to local water supply and water quality from poorly planned and

25  inefficient land development, and an overall decrease in quality of life.

26      7.    By this action, LandWatch seeks to protect the interests of its members, directors, and staff,

27  and to enforce a public duty owed to them by the County.  Because the claims asserted and the relief

28  sought in this petition are broad-based and of a public as opposed to a purely private or pecuniary

1  nature, direct participation in this litigation by LandWatch's individual members is not necessary.

2      8.    LandWatch presented oral and written comments in opposition to the Revised Project,

3  including comments on the proposed Addendum, to the County prior to and during the public hearings

4  culminating in the County's November 7, 2005 approvals.

## Rancho San Juan Opposition Coalition

6      9.    Petitioner RANCHO SAN JUAN OPPOSITION COALITION ("the Coalition") is an

7  unincorporated association of citizens, residents, property owners, and taxpayers in Monterey County.

8  The Coalition's members currently enjoy the multitude of aesthetic, recreational, and health benefits

9  stemming from the current undeveloped state of the Revised Project area. These include: clean air,

10  preserved natural resources, agricultural productivity, unobstructed views of the natural landscape,

11  hiking trails, and traffic levels significantly less than those they will experience if the Revised Project

12  proceeds.

13      10.    The Coalition's members have a clear and present right to, and beneficial interest in, the

14  County's performance of its duties to comply with CEQA, the State Planning and Zoning Law, Senate

15  Bill 610, Senate Bill 221, and the Monterey County Code. As citizens, homeowners, taxpayers, and

16  electors, the Coalition's members are within the class of persons to whom the County owes such duties.

17      11.    The Coalition's members will also suffer direct injury as a result of the Revised Project's

18  adverse environmental, public health, aesthetic, and land use impacts. These include: the permanent loss

19  of vast quantities of currently undeveloped open space and agricultural lands, blighting of the area's

20  landscape, air pollution associated with increased vehicle traffic from construction and operation of the

21  Revised Project, permanent loss of habitat for plant and animal species including species protected

22  under state and federal law, loss of recreational opportunities, increased traffic congestion in the area,

23  impacts to local water supply and water quality from poorly planned and inefficient land development,

24  and an overall decrease in quality of life.

25      12.    By this action, the Coalition seeks to protect the interests of its members and to enforce a

26  public duty owed to them by the County. Because the claims asserted and the relief sought in this

27  petition are broad-based and of a public as opposed to a purely private or pecuniary nature, direct

28  participation in this litigation by the Coalition's individual members is not necessary.

13.     The Coalition presented oral and written comments in opposition to the Revised Project, including comments on the Addendum, to the County prior to and during the public hearings culminating in the County's November 7, 2005 approvals.

## County of Monterey

14.     Defendant COUNTY OF MONTEREY ("County") is a political subdivision of the State of California. On November 7, 2005, the County, through its Board of Supervisors, approved general plan and area plan amendments, a specific plan, and zoning changes, and certified an Addendum under CEQA for the Revised Project. The County is the "Lead Agency" responsible under CEQA for evaluating the environmental impacts of this Revised Project. The County is also the entity responsible under the State Planning and Zoning Law, Senate Bill 610, Senate Bill 221, and the Monterey County Code for evaluating and approving the Revised Project with respect to its compliance with all applicable local planning, zoning, and land use ordinances.

## H-Y-H Corporation

15.     Petitioners are informed and believe that Real Party In Interest H-Y-H CORPORATION ("H-Y-H") is a Delaware Corporation maintaining a California address at 655 Redwood Highway, Suite 332, Mill Valley.  H-Y-H is the applicant for and recipient of the land use entitlements and permits issued by the County for the Revised Project on November 7, 2005 and challenged herein.

## Does

16.     Petitioners currently do not know the true names of DOES I through XXV inclusive, and therefore name them by such fictitious names.  Petitioners will seek leave from the court to amend this petition to reflect the true names and capacities of DOES I through XXV inclusive once ascertained.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to Public Resources Code sections 21167 and 21168, Government Code sections 65751 and 65860, and Code of Civil Procedure sections 1085 and 1094.5. Venue is proper in the County of Monterey under Code of Civil Procedure section 395.

## PROCEDURAL HISTORY AND AGENCY ACTION

18.     The Butterfly Village area of the Revised Project consists of 671 acres and is located in northern portion of Monterey County in a region known as the Greater Salinas Area.  Butterfly Village's

Petition for Writ of Mandate & Complaint
For Declaratory & Injunctive Relief

4

DEC-08-2005  16:46        MO. CO. COUNSEL                B31 771 0595   P.08/23
                          OAKLAND SUP
                                          (FAX)518 873 4084         P. 007/042

1  triangular site is located north of, but not adjacent to, the City of Salinas and is bounded by the historic

2  Bolsa de Escarpines Rancho and other farm and grazing land.

3       19.  Land uses in the Revised Project area are governed by the goals, policies, and objectives of

4  the Monterey County General Plan, the Greater Salinas Area Plan, and the Rancho San Juan Area of

5  Development Concentration Development Guidelines and Principles.  The land use, traffic and

6  circulation, conservation, safety, and noise elements of the General Plan were last updated in 1982.  The

7  housing and open space elements were last updated in 1992.

8       20.  The Greater Salinas Area Plan, which is part of the Monterey County General Plan, was

9  adopted in 1985, and last updated in 1996.  Policy 26.1.4.1 of the Greater Salinas Area Plan designates

10 an Area of Development Concentration ("ADC") area, requires a specific plan before development of

11 the ADC, and requires that the specific plan incorporate the Rancho San Juan Area of Development

12 Concentration Development Guidelines and Principles.  As initially designated, the Rancho San Juan

13 ADC area consisted of 2,150 acres, which were bounded by Russell Road to the south and Harrison

14 Road to the west.

15      21.  On or about September 27, 2003, H-Y-H applied to the County for various land use

16 entitlements to develop the original version of the project.  The application sought amendments to the

17 Monterey County General Plan and the Greater Salinas Area Plan, changes to the Monterey County

18 Zoning Ordinance and Subdivision Ordinance, and approvals of a specific plan, development permit,

19 development agreement, vesting tentative map, use permits, and various other approvals (collectively,

20 the "Initial Project").  The County deemed the application complete on February 3, 2003.

21      22.  On or about July 21, 2003, the County released a draft Rancho San Juan Specific Plan (the

22 "Initial Specific Plan").  The County later revised the Initial Specific Plan on or about March 15, 2004.

23      23.  The Initial Specific Plan covered the Rancho San Juan Area of Development Concentration

24 and included 4,000 residential units, 373,000 square feet of retail/community space, 2.4 million square

25 feet of light industrial/business park use, 243,000 square feet of office development, an 18-hole golf

26 course and clubhouse, a small hotel, parks, and open space.  It was the largest single development ever

27 proposed in Monterey County.

28

DEC-08-2005 16:46     MO. CO. COUNSEL     831 771 0595     P.09/23
                      ONE L    OAKLAND-80P-
                                    (FAX)510 87    384
                                                         P.008/042

24.    The Initial Project included revisions to the General Plan and Greater Salinas Area Plan that increased the size of the Rancho San Juan ADC to 2581 acres, adding the area between Russell Road and Salinas (the "Russell Road Study Area" intended to make the ADC contiguous with the City of Salinas) and the area between Harrison Road and 101 (the "Harrison Road Redevelopment Area"). The Initial Project adopted land use designations for the ADC area by referencing the land uses set out in the Initial Specific Plan.

25.    The Initial Project amended the County zoning ordinance to adopt an "SP" (Specific Plan) land use designation and regulations for its use, and to apply the SP designation to the area encompassing the Rancho San Juan ADC and Initial Specific Plan area.

26.    On or about May 18, 2004, the County filed a Notice of Availability and circulated a Draft EIR for the Initial Project based on the Initial Specific Plan. The public review period was from May 19, 2004 to July 12, 2004.

27.    Several interested agencies, private individuals, and organizations, including Petitioners, provided written comments on the Draft EIR during the public comment period. State and local agencies with jurisdiction over resources impacted by the Initial Project also submitted comments.

28.    In their comments, Petitioners and others challenged the scope and adequacy of the Draft EIR's analysis of environmental impacts associated with the Initial Project, its conclusions regarding the significance of such impacts, and its recommendations for mitigating them. Petitioners and others also challenged the Initial Project's consistency with the General Plan and applicable regional plans and its compliance with Senate Bill 610 and Senate Bill 221.

29.    On or about November 8, 2004, the County released a Final EIR for the Initial Project.

30.    On December 2, 2004, the County's Planning Commission held a public hearing on the Initial Project. Following the hearing, the Planning Commission adopted a resolution recommending that the County Board of Supervisors: (a) not certify the Final EIR for the Initial Project; (b) not adopt the proposed general plan and area plan amendments; (c) not adopt the Initial Specific Plan; (d) not approve the proposed zoning changes; (e) deny the development permit; and (f) not approve the proposed Development Agreement between H-Y-H and the County.

DEC-08-2005  16:47        MO. CO. COUNSEL                     831 771 0595    P.10/23
ONE LE... OAKLAND SOP        — ...       (FAX)510 873...84
                                                            P. 009/042

31.   On December 14, 2004, the County Board of Supervisors conducted a hearing on the *Initial Project*, at which Petitioners and others presented oral comments opposing the Initial Project. Following the hearing, the Board voted to reject the Planning Commission's recommendations, and to adopt resolutions and ordinances approving entitlements and permits for the Initial Project, and certifying the Final EIR.

32.   Included in the County's recitals approving the General Plan and Area Plan amendments were findings that the amendments were compatible and internally consistent with the County General Plan and the Greater Salinas Area Plan.

33.   Included in the County's recitals approving the Rancho San Juan Specific Plan were findings that the Initial Specific Plan was consistent with the County General Plan and Greater Salinas Area Plan, and would implement the goals and objectives of those plans in the Initial Project area.

34.   Included in the County's findings approving the Butterfly Village combined development permit were findings that the Butterfly Village development was consistent with the Initial Specific Plan, the Monterey County General Plan, as proposed to be amended, and the Greater Salinas Area Plan, as proposed to be amended.  Also included were findings that the Butterfly Village development was in compliance with all rules and regulations pertaining to zoning uses, subdivisions, and any other applicable provisions of Title 21 of the Monterey County Code (Zoning), as proposed to be amended.

35.   Included in the County's findings certifying the EIR for the Initial Project were findings that: (a) the EIR evaluated all potentially significant environmental impacts that could result from the approval of the Initial Project, alternatives to the Initial Project, and measures designed to mitigate or avoid the potentially significant impacts of the Initial Project; (b) the Initial Project would cause certain significant environmental impacts that were either less-than-significant, or that would be reduced to a less-than-significant level as a result of implementing feasible mitigation measures; (c) the Initial Project would cause certain other significant adverse environmental impacts that are unavoidable even after mitigation, and that no additional feasible mitigation measures are available to reduce these impacts to less-than-significant levels; and (d) that alternatives to the Initial Project or the Initial Project location that would reduce or avoid potentially significant impacts, including a "No Project" alternative, as evaluated in the EIR, were infeasible or "less desirable" due to economic, social, or other considerations.

DEC-08-2005  16:48        MO—CO. COUNSEL                        831 771 0595    P.11/23
                          ONE LE  OAKLAND SOP
                                        (FAX)510-873-8884              P.010/042

36.   The Board's findings also included a finding that no facts, reasonable assumptions predicated on facts, testimony supported by adequate factual foundation, or expert opinion supported by facts, had been submitted that refute the conclusions reached by the studies, data, reports and analysis contained in the Final EIR.

37.   In adopting a statement of overriding considerations pursuant to Section 21080 of the Public Resources Code, the Board found that economic, legal, social, technological, or other benefits of the Initial Project outweighed their unavoidable adverse environmental effects so that the adverse environmental effects may be considered "acceptable."

38.   The Board's findings certifying the EIR also included a finding that recirculation of a revised Draft EIR was not required because "amplifications and clarifications made to the Draft EIR in the Final EIR do not collectively or individually constitute significant new information within the meaning of Public Resources Code Section 21092.1 and CEQA Guidelines Section 15088.5, and because the Final EIR does not contain significant new information, as defined in CEQA Guidelines Section 15088.5, which would require re-circulation of the modified sections or entire document."

39.   On December 16, 2004 the County filed and posted a "Notice of Determination" in compliance with Public Resources Code section 21152.

40.   In its resolution adopting the Initial Specific Plan the Board acknowledged that it had "grave doubts about the desirability of adopting the [Initial] Specific Plan because of the concerns raised by the Planning Commission in its resolution of December 2, 2004 and the public testimony received by the Board." The Board noted major issues related to traffic, water use, and affordable housing and questioned the wisdom of having an Area of Development Concentration in the Rancho San Juan Area. However, the Board stated that the County was under legal compulsion to adopt a specific plan and "must act now in order to avoid further claims of liability" from H-Y-H.

41.   Accordingly, in its resolution adopting the Initial Specific Plan the Board directed staff and the County Counsel to return to the Board within six months with recommendations regarding removal of the Area of Development Concentration from the General Plan and Greater Salinas Area Plan and amending or rescinding the Initial Specific Plan as appropriate.

DEC-08-2005  16:48      MO. CO. COUNSEL      831 771 0595   P.12/23
ONE L    OAKLAND SOP
(FAX)510 873 0384—                                    P. 011/042

42.   In January, 2005, Petitioners and four other parties, including the City of Salinas and the California Department of Transportation ("Caltrans"), filed petitions seeking a writ of mandate to set aside the December 14, 2004 approvals of the Initial Project and complaints seeking to enjoin development of the Initial Project.

43.   In January, 2005 Petitioners circulated petitions among the Monterey County electorate to qualify a referendum challenging the December 14, 2004 Resolution 04-421 approving the General Plan amendments the Board of Supervisors had found essential to approval of the Initial Project. Sufficient signatures were certified to require that the Board of Supervisors either repeal Resolution 04-421 or put it to a vote of the electorate.

44.   The Board of Supervisors did not repeal Resolution 04-421 and instead set the matter for a vote of the electorate on November 8, 2005.

45.   In accordance with Election Code section 9145, Resolution 04-421 did not become effective pending the November 8, 2005 election. On November 8, 2005 the voters of Monterey County voted to repeal the General Plan amendments in Resolution 04-421. Thus, the General Plan amendments in Resolution 04-421 that the County found essential to approval of the Initial Project never took effect and are null and void.

46.   On September 20, 2005, the County released a public review draft of the Revised Rancho San Juan Specific Plan (the "Revised Specific Plan"). The boundaries of the Revised Specific Plan correspond to the 671-acre H-Y-H Property, i.e., the Butterfly Village development. The Revised Specific Plan provided for land uses that include 1,147 residential units, a golf course and 71 guest villas/timeshare units, 45,000 sq. ft. of retail commercial development, 11.8 acres of public parks, 141.2 acres of open space, a wastewater treatment plant and police and fire stations.

47.   Compared to the Initial Specific Plan, the Revised Specific Plan eliminated 2,853 residential units, including almost all of the highest density units. The Revised Specific Plan eliminated all but 45,000 sq. ft. (1.2%) of the originally proposed 3,676,850 sq. ft. of commercial/mixed use development, including the town center, the neighborhood center, the employment center, the office/professional uses, and the live/work uses. The Revised Specific Plan eliminated the requirement to provide various public facilities, including schools.

48.   In order to permit the adoption of the Revised Specific Plan, the County proposed to amend its General Plan, the Greater Salinas Area Plan, the Rancho San Juan Area of Development Concentration Development Guidelines and Principles, and the Monterey County Zoning ordinance. These amendments, together with the adoption of the Revised Specific Plan and the rescinding of the Initial Specific Plan, constitute the Revised Project.

49.   The General Plan and Greater Salinas Area Plan amendments for the Revised Project except the Revised Specific Plan from goals and policies that require the County to protect viable farmlands; to maintain County standards for new road and interior circulations systems; and to ensure that development not cause unmitigated traffic impacts.

50.   Amendments to the Greater Salinas Area Plan for the Revised Project designate a new Rancho San Juan Area of Development Concentration with boundaries that are coterminous with the 671-acre Revised Specific Plan.

51.   The amendments to the Greater Salinas Area Plan for the Revised Project designate land uses for the 671-acre Butterfly Village development by referencing the land uses set out in the Revised Specific Plan.

52.   The amendments to the Greater Salinas Area Plan for the Revised Project eliminate the requirement that a Specific Plan incorporating the Rancho San Juan ADC Development Guidelines and Principles be prepared for the development of the area in the former ADC that is outside the 671-acre Butterfly Village development.  In effect, the amendments permit development of this area without a specific plan or adherence to the Development Guidelines and Principles.

53.   Amendments to the Rancho San Juan ADC Developments Guidelines and Principles for the Revised Project substantially narrow the scope of the new ADC by numerous elements and requirements, including all planned industrial uses; the requirement that the Highway 101 freeway bypass should provide the major access to the site; the requirement that the ADC development be phased and managed to provide a jobs/housing balance; the requirement that the majority of flat areas be reserved for industrial uses; and the requirement that a fire station, library, schools, community centers, and, if needed, a police station, should be provided.

54.   By approving the Revised Project and rescinding the Initial Specific Plan, the County substituted an isolated 671-acre golf-course and low density residential development for the long-planned and initially approved 2,581-acre mixed use development adjacent to the City of Salinas.

55.   The Revised Project causes unmitigated traffic impacts that conflict with General Plan and Greater Salinas Area Plan goals and policies.

56.   The Revised Project renders the General Plan and Greater Salinas Area Plan inconsistent because the circulation element no longer supports the land use element.

57.   The 1982 Monterey County General Plan Circulation element is no longer adequate to support the Land Use element because of 22 years of largely unanticipated growth.  County staff advised the Board of Supervisors that a General Plan update was required because the existing road network is deficient to serve existing demand, that many roads in the northern portion of the county are currently operating at Level of Service F, and that the addition of more trips due to growth further strains these roads beyond planned capacity.  These deficiencies have not been remedied and the Revised Project exacerbates them.

58.   The Revised Project conflicts with numerous General Plan and Greater Salinas Area Plan policies, including policies regarding agriculture, growth, ridgeline and slope development, and water resources.

59.   The County's action to eliminate the ADC designation from the bulk of the former ADC area resulted in there being no land use designations for the former ADC area outside the 671-acre Butterfly Village development.

60.   The County's action to rescind the Initial Specific Plan resulted in there being no designation of permitted uses in the zoning ordinance for the areas in the former ADC outside the Butterfly Village development.

61.   On October 7, 2005 the County released an EIR Addendum to the Final Environmental Impact Report for the Initial Project, purportedly pursuant to the requirements of CEQA Guidelines section 15164.  The Addendum purported to evaluate the proposal to reduce the area of the adopted Initial Specific Plan from 2,581 to 671 acres and to amend the General Plan and Zoning Code.

DEC-08-2005  16:50       MO. CO. COUNSEL                    831 771 0595    P.15/23
UNC LE      OAKLAND SOP             (FAX)510 87        4        P.014/042

1    62.   The Addendum consisted of 86 pages with over 750 pages of supporting technical studies.
2  The Addendum was released 7 business days prior to the Planning Commission hearing on October 19,
3  2005.

4    63.   The Addendum included an entirely new 653-page traffic analysis. The new traffic analysis
5  found that significant, unmitigated traffic impacts would occur at 16 intersections at which the traffic
6  study for the Initial Project had not found significant impacts. The new traffic analysis identified other
7  intersections at which significant traffic impacts from the Revised Project would be more severe than for
8  the Initial Project. Nonetheless, the Addendum concluded that the Revised Project would not result in
9  any new or more severe significant traffic impacts than the Initial Project.

10    64.   The Addendum included a new Water Supply Assessment ("WSA") from California Water
11  Service Company, which purported to be prepared in compliance with Senate Bill 610, Water Code
12  sections 10910 *et seq.* The new WSA concluded that the Revised Project would use 25 acre-feet of
13  water *more* than existing agricultural uses on the Butterfly Village site. The WSA prepared for the
14  Initial Project had concluded that the Butterfly Village Project would use *less* water than existing
15  agricultural uses on the site. Nonetheless, the Addendum concluded that the Revised Project would not
16  have significant individual or cumulative impacts.

17    65.   The Addendum provided no analysis of removing General Plan land use and zoning
18  designations from the area included in the former ADC but not included in the Butterfly Village
19  development.

20    66.   The Addendum provided no analysis of eliminating the requirement that the area included in
21  the former ADC but not included in the Butterfly Village development be developed only in accordance
22  with a specific plan incorporating the Rancho San Juan ADC Development Guidelines and Principles.

23    67.   The Addendum referenced a new analysis of the consistency of the Revised Project with the
24  General Plan and Greater Salinas Area Plan. That analysis purported to reflect the proposed
25  amendments to the General Plan and the Greater Salinas Area Plan that are part of the Revised Project.
26  However, in many instances the consistency analysis reflected the amendments that were adopted in
27  connection with the Initial Project.

28

DEC-09-2005  16:58        MTY CO. COUNSEL          831 771 0595   P.16/23
UNE LEE  OAKLAND SOP          (FAX)510-676-6884
                                                              P.015/042

68.   On October 19, 2005, the County's Planning Commission held a public hearing on the Revised Project at which Petitioners and others presented oral and written comments opposing the Revised Project. Following the hearing, the Planning Commission adopted a resolution recommending that the County Board of Supervisors approve the Revised Project.

69.   On approximately November 2, 2005, County staff released a staff report containing newly proposed amendments to the General Plan and the Greater Salinas Area Plan and a new analysis of the consistency of the Revised Project with the General Plan and the Greater Salinas Area Plan.

70.   On November 7, 2005, the County Board of Supervisors conducted a hearing on the Revised Project, at which Petitioners and others presented additional oral and written comments opposing the Revised Project. Following the hearing, the Board voted to (a) certify the EIR Addendum; (b) adopt the proposed General Plan and greater Salinas Area Plan amendments; (c) rescind the Initial Specific Plan and approve the Revised Specific Plan; and (d) approve the proposed zoning changes.

71.   In certifying the Addendum to the FEIR for the Revised Project, the County found that no supplemental or subsequent EIR was needed because (a) there had been no substantial changes to the Initial Project which require major revisions to the FEIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; (b) no substantial changes had occurred with respect to the circumstances under which the Revised Project was undertaken which would require major revisions to the FEIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; and (c) no newly available information showed that the Revised Project would have new or more severe significant impacts, and (d) no mitigation measures or alternatives previously found infeasible, or considerably different than those identified in the FEIR, would substantially reduce one or more significant effects but the applicant declined to adopt them. Evidence for this finding included the Addendum, staff presentations, and the analysis of the Butterfly Village project in the FEIR.

72.   In adopting amendments to the General Plan, the Greater Salinas Area Plan, and the Rancho San Juan Area of Development Concentration Development Guidelines and Principles, the County found that the amendments were compatible and internally consistent with the General Plan and the Greater Salinas Area Plan. The County found that the Revised Specific Plan was consistent with the

1  General Plan and the Greater Salinas Area Plan. The County also found that the FEIR for the Initial

2  Project included and analyzed the environmental impacts associated with the amendments.

3  73.  The County had adopted a statement of overriding considerations pursuant to Section 21080

4  of the Public Resources Code in connection with its approval of the Initial Project, which included

5  benefits that the Revised Project will not realize, such as the provision of designated numbers of units

6  affordable housing and employment opportunities.  County staff did not prepare a separate statement of

7  overriding considerations in support of the County's approval of the Revised Project.

8  74.  On November 8, 2005 the County filed a Notice of Determination indicating (1) that the

9  County had determined that the Revised Project will have a significant effect on the environment; (b)

10  that an EIR Addendum was prepared and certified for the Revised Project; (c) that mitigation measures

11  were made a condition of approval of the Revised Project and that the previously approved mitigation

12  monitoring plan/program with two modifications was found to apply to the Revised Project; (d) that

13  findings were made pursuant to CEQA; and (e) that a statement of overriding considerations was

14  adopted for the Revised Project.

15

16  ## FIRST CLAIM FOR RELIEF

### (Violation of CEQA)

17  75.  Petitioners here incorporate by reference the preceding paragraphs in their entirety.

18  76.  At all times relevant to this action the County was the "Lead Agency" responsible for the

19  review and approval of the Revised Project under Public Resources Code section 21067.

20  77.  A Lead Agency may not approve a development project without performing the

21  environmental review required by CEQA.

22  78.  Under CEQA, the County was required to prepare an EIR that included an accurate, stable,

23  and finite project description, and a detailed statement setting forth all of the following: (a) all

24  significant effects on the environment of the proposed project; (b) any significant effect on the

25  environment that cannot be avoided if the project is implemented; (c) any significant effect on the

26  environment that would be irreversible if the project is implemented; (d) mitigation measures proposed

27  to minimize significant effects on the environment; (e) alternatives to the proposed project, including

28  alternative locations; (f) the growth-inducing impact of the proposed project.

DEC-08-2005 16:52   MO. CO. COUNSEL   831 771 0595   P.18/23
ONE LEGAL OAKLAND SUP   (FAX)510 873 4   P.017/042

79.   Under Public Resources Code section 21110, the EIR was also required to contain a statement briefly indicating the reasons for determining that various effects on the environment of the Project were not significant and consequently were not discussed in detail in the EIR.

80.   Under Public Resources Code section 21100(b)(2)(A), when preparing an environmental impact report a Lead Agency must identify all significant effects on the environment caused by a proposed project that cannot be avoided.

81.   Under 14 C.C.R. section 15125(d) an EIR must discuss any inconsistency between the proposed project and applicable general plans and regional plans.

82.   Under Public Resources Code section 21100(b)(3), when preparing an environmental impact report a Lead Agency must identify mitigation measures to minimize significant impacts on the environment. A lead agency may not improperly defer the formulation of mitigation measures until a future time.

83.   Under Public Resources Code section 21081(a), a Lead Agency may not approve a project for which an EIR identifies a significant environmental impact unless the impact has been mitigated or avoided by changes in the project or unless the agency specifically finds that overriding benefits outweigh the significant effects on the environment.

84.   Under Public Resources Code section 21166 and 14 C.C.R. sections 15162 and 15163, a lead agency is required to prepare a supplemental or subsequent EIR if (a) there are substantial changes to a project which require major revisions to an EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; (b) substantial changes occur with respect to the circumstances under which a project is to be undertaken which would require major revisions to the EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; (c) newly available information shows that a project would have new or more severe significant impacts, or (d) newly available information shows that mitigation measures or alternatives previously found infeasible, or considerably different than those identified in the EIR, would substantially reduce one or more significant effects but the applicant declines to adopt them.

## Count One – Inadequate Project Description

85.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

86.   Under CEQA, an EIR must include a finite, stable, accurate and meaningful project description. (14 C.C.R. § 15124.)

87.   The Addendum and the EIR fail to include a complete, accurate, stable, finite, and meaningful description of the Revised Project as required by CEQA. The project description omits key project features that have the potential to cause significant impacts, including meaningful descriptions of the landscape alternation and grading that will be required to construct the Revised Project; the proposed uses of the Revised Project; the layout and nature of the Revised Project's improvements, lots, buildings, and infrastructure; and the construction activities required to build the Revised Project.

88.   The County therefore prejudicially abused its discretion in certifying the Addendum by failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by the evidence.

## Count Two – Inadequate Description Of Environmental Setting

89.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

90.   Under CEQA, an EIR must include a description of the physical environmental conditions in the vicinity of the project as they existed at the time the notice of preparation is published, with particular focus on the regional setting. 14 C.C.R. § 15125.

91.   An EIR must also discuss any inconsistencies between the proposed project and applicable general plans and regional plans. 14 C.C.R. § 15125(c).

92.   The EIR and Addendum fail to include an accurate description of the Revised Project's physical and environmental setting, and fail to identify or discuss numerous inconsistencies between the Revised Project and the Monterey General Plan, the Greater Salinas Area Plan, and applicable regional plans, including the Monterey County Water Resources Agency Ordinance No. 3539, the Monterey County Groundwater Ordinance No. 4037, the Monterey Bay Unified Air Pollution Control District's 2004 Air Quality Management Plan, the Central Coast Regional Water Quality Control Board's Water Quality Management Plan, the Boronda Memorandum of Understanding, the City of Salinas General Plan, and the 2002 Monterey County Regional Transportation Plan.

93.   The County therefore prejudicially abused its discretion in certifying the Addendum, by failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by the evidence.

### Count Three - Failure To Evaluate Adequately All Significant Project Impacts

94.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

95.   Under CEQA, an EIR must identify and evaluate the direct, indirect, and cumulative environmental impacts of all phases of a project. 14 C.C.R. § 15126. The discussion must include relevant specifics of the area, the resources involved, physical changes, alterations to ecological systems, and changes induced in population distribution, population concentration, the human use of the land (including commercial and residential development), health and safety problems caused by the physical changes, and other aspects of the resource base such as water, historical resources, scenic quality, and public services. 14 C.C.R. § 15126.2.

96.   The EIR and Addendum for the Revised Project fail to evaluate all the Revised Project's significant direct, indirect, and cumulative impacts, including impacts on aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning, mineral resources, noise, population and housing, public services, recreation, transportation and traffic, water resources, and utilities.

97.   The County therefore prejudicially abused its discretion in certifying the Addendum, by failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by the evidence.

### Count Four - Failure To Evaluate Adequately All Feasible Mitigation Measures

98.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

99.   An EIR must describe and evaluate feasible measures for minimizing or avoiding a project's direct, indirect, and cumulative impacts on the environment. 14 C.C.R. § 15126.4.

100.   The EIR and Addendum for the Revised Project fail to describe and evaluate all reasonable, feasible mitigation measures for the Revised Project's direct, indirect, and cumulative impacts, including impacts on aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning,

1  mineral resources, noise, population and housing, public services, recreation, transportation and traffic,

2  water resources, and utilities.

3     101.  The County therefore prejudicially abused its discretion in certifying the Addendum, by

4  failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by

5  the evidence.

6                   **Count Five – Improper Deferral Of Mitigation**

7     102.  Petitioners here incorporate by reference the preceding paragraphs in their entirety.

8     103.  The EIR and Addendum improperly defer to a future date evaluation of mitigation measures

9  for the Revised Project's impacts, including those on aesthetics, agricultural resources, air quality,

10 biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology

11 and water quality, land use and planning, mineral resources, noise, population and housing, public

12 services, recreation, transportation and traffic, water resources, and utilities.

13    104.  The County therefore prejudicially abused its discretion in certifying the Addendum, by

14 failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by

15 the evidence.

16               **Count Six - Inadequate Analysis of Project Alternatives**

17    105.  Petitioners here incorporate by reference the preceding paragraphs in their entirety.

18    106.  An EIR must describe a range of reasonable alternatives to the project, or to the location of

19 the project, which would feasibly attain most of the basic objectives of the project but would avoid or

20 substantially lessen any of the significant effects of the project, and evaluate the comparative merits of

21 the alternatives. 14 C.C.R. § 15126.6.  An EIR must include sufficient information about each

22 alternative to allow meaningful evaluation, analysis, and comparison with the proposed project. (*Id.*)

23    107.  The EIR and Addendum fail to identify and evaluate a reasonable range of alternatives to the

24 Revised Project, including alternative site designs, layouts, facilities placements, and configurations that

25 would avoid or minimize significant impacts.

26    108.  The County therefore prejudicially abused its discretion in certifying the Addendum, by

27 failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by

28 the evidence.

## Count Seven – No Supported Statement Of Overriding Considerations

109.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

110.    Under Public Resources Code section 21081(b), an agency may not approve a project with significant unavoidable impacts unless it finds, based on substantial evidence, that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.

111.    The EIR and Addendum identify several impacts as unavoidably significant.  The County found these impacts acceptable in connection with the Initial Project due to overriding economic, legal, social, technological, and other benefits of the initial Project.

112.    There is no substantial evidence in the record to support this finding with respect to the Revised Project.  There is substantial evidence in the record that disproves such a finding.

113.    The County did not make a finding in connection with the Revised Project that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.

114.    The County therefore prejudicially abused its discretion in certifying the Addendum, by failing to proceed in the manner required by CEQA, and/or by adopting findings that are not supported by the evidence.

## Count Eight – Failure To Prepare a Subsequent or Supplemental EIR

115.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

116.    Under Public Resources Code section 21166 and 14 C.C.R. sections 15162 and 15163, a lead agency is required to prepare a supplemental or subsequent EIR if there are substantial changes to a project which require major revisions to an EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; (b) substantial changes occur with respect to the circumstances under which a project is to be undertaken which would require major revisions to the EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified effects; (c) newly available information shows that a project would have new or more severe significant impacts, or (d) newly available information shows that mitigation measures or alternatives previously found infeasible,

1  or considerably different than those identified in the EIR, would substantially reduce one or more

2  significant effects but the applicant declines to adopt them.

3      117.    In adopting the Revised Project, the County made substantial changes to the Initial Project

4  which required major revisions to the FEIR due to the involvement of new significant environmental

5  effects or a substantial increase in the severity of previously identified effects. For example, changes to

6  the Initial Project will result in additional and more severe significant traffic and water resources

7  impacts.

8      118.    Substantial changes occurred after the adoption of the Initial Project with respect to the

9  circumstances under which the Revised Project is to be undertaken which require major revisions to the

10 EIR due to the involvement of new significant environmental effects and a substantial increase in the

11 severity of previously identified effects. For example, increased uncertainty as to the availability of the

12 Salinas Valley Water Project indicates that water supply impacts are more severe.

13     119.    Newly available information shows that the Revised Project will have new or more severe

14 significant impacts than the Initial Project. For example, the newly available Water Supply Assessment

15 indicates that the Revised Project will increase rather than decrease the use of groundwater at the

16 Butterfly Village site.

17     120.    Newly available information shows that mitigation measures or alternatives previously found

18 infeasible, or considerably different than those identified in the EIR, would substantially reduce one or

19 more significant effects but the applicant declined to adopt them. For example, information about the

20 feasibility of exacting transit impact fees for other development projects indicates that the applicant

21 could feasibly have increased its transit impact fees to reduce the severity of unmitigated traffic impacts.

22     121.    The County therefore prejudicially abused its discretion in certifying the Addendum and

23 failing to prepare a subsequent or supplemental EIR, by failing to proceed in the manner required by

24 CEQA, and by adopting findings that are not supported by the evidence.

25                          SECOND CLAIM FOR RELIEF

26                      (Violation of State Planning and Zoning Law)

27     122.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

28

DEC-08-2005  16:56      MP  CO. COUNSEL                              831 771 0595      P.01/16
                        ONE L    OAKLAND 80P          (FAX)510     0084          P. 023/042

123.    Under the Planning and Zoning Law, Government Code section 65000 et seq., a local public agency may entitle a proposed land use only if the land use is consistent with the goals, policies, and objectives contained in a valid, current, internally consistent General Plan, and with all applicable duly adopted zoning ordinances.

124.    Government Code section 65300.5 requires that a general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency.

125.    Government Code section 65302(b) provides that the circulation element of a general plan shall be correlated with the land use element.

126.    Government Code section 65103(a) requires a local planning agency, including the County, to periodically review, and revise, as necessary, its general plan.

127.    Government Code section 65751 provides that a writ of mandate under Code of Civil Procedure section 1085 may be obtained to challenge a general plan or element thereof on the grounds that such a plan or element does not comply with the requirements for general plans set forth at Government Code section 65300 et seq.

128.    Government Code section 65754 requires that where a court finds that a general plan or element thereof does not comply with requirements for general plans set forth at Government Code section 65300 et seq., the County shall bring its general plan into compliance within 120 days.

129.    Government Code section 65755 provides that the court may also order relief including suspension of authority to issue permits, to grant zoning changes, and to grant subdivision map approvals.

130.    Code of Civil Procedure section 1094.5 provides that a court shall issue a writ of administrative mandamus where a public agency, in a proceeding in which by law a hearing is required to be given, has committed a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

### Count Nine – Invalid General Plan

131.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

DEC-08-2005  16:56       MO. CO. COUNSEL       831 771 0595    P.02/16
                         ONE D     UAKLANO SOP

(FAX)510 ☎ 0884                              P. 024/042

132.   The Monterey County General Plan is incomplete, internally inconsistent, out-of-date, and fails to comply with all applicable statutory criteria under the State Planning and Zoning Law.

133.   The Monterey County General Plan therefore fails to comply with the requirements for general plans set forth at Government Code section 65300, et seq.

**Count Ten – Project Not Consistent With Valid, Current General Plan**

134.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

135.   At the time of the County's approvals of the Revised Project and related General Plan and Greater Salinas Area Plan amendments challenged herein, the Monterey County General Plan was incomplete, internally inconsistent, out-of-date, and failed to comply with all applicable statutory criteria under the Planning and Zoning Law.

136.   The Revised Project is therefore not consistent with a valid, current, internally consistent General Plan.

137.   The Revised Project further directly implicates the inadequacies of the General Plan.

138.   The County's action approving the Revised Project was therefore arbitrary and capricious and/or constituted a prejudicial abuse of discretion, in that the County failed to proceed in the manner required by the State Planning and Zoning Law, and adopted findings of General Plan consistency that are not supported by the evidence.

**Count Eleven – Amendments Render General Plan Inadequate And Internally Inconsistent**

139.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

140.   The Planning and Zoning law requires General Plans to be internally consistent and that the circulation element be correlated with the land use element.

141.   At the time of the County's approvals of the Revised Project and related General Plan and Greater Salinas Area Plan amendments challenged herein, the Monterey County General Plan was incomplete, internally inconsistent, out-of-date, and failed to comply with all applicable statutory criteria under the Planning and Zoning Law.

142.   In approving the Revised Project, the County amended the County General Plan.

143.   As a direct result of these amendments, the County General Plan's circulation element is not correlated with its land use element, and the General Plan is otherwise inadequate and internally inconsistent.

144.   The amendments to the General Plan further directly implicate the pre-existing inadequacies of the County General Plan.

145.   The County's action in adopting General Plan amendments was therefore arbitrary and capricious and/or constituted a prejudicial abuse of discretion, in that the County failed to proceed in the manner required by the Planning and Zoning Law and adopted findings of General Plan consistency that are not supported by the evidence.

**Count Twelve—Greater Salinas Area Plan Amendments Render General Plan Inadequate And Internally Inconsistent**

146.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

147.   The Planning and Zoning law requires General Plans to be internally consistent and that the circulation element be correlated with the land use element.

148.   In approving the Revised Project, the County amended the Greater Salinas Area Plan, including the Rancho San Juan Areas of Development Concentration Development Guidelines and Principles, which are part of the County General Plan.

149.   At the time of the County's approvals of the Revised Project and related General Plan and Area Plan amendments challenged herein, the Monterey County General Plan was incomplete, internally inconsistent, out-of-date, and failed to comply with all applicable statutory criteria under the Planning and Zoning Law.

150.   The amendments to the Greater Salinas Area Plan and the Rancho San Juan Areas of Development Concentration Development Guidelines and Principles are inconsistent with the goals, policies, and implementation plans in the County General Plan, including those concerning land use, agriculture, transportation, growth, water, open space, conservation, and safety.

151.   The amendments to the Greater Salinas Area Plan and the Rancho San Juan Areas of Development Concentration Development Guidelines and Principles further directly implicate the inadequacies of the County General Plan.

DEC-09-2005 16:56      MO. CO. COUNSEL                831 771 0595    P.04/16
UNE L   OAKLAND SCP           (FAX)510 8  0084        P.028/042

152.    As a direct result of the amendments to the Greater Salinas Area Plan and the Rancho San Juan Areas of Development Concentration Development Guidelines and Principles, the County General Plan's circulation element is not correlated with its land use element, and the General Plan is otherwise inadequate and internally inconsistent.

153.    The County's action amending the Greater Salinas Area Plan the Rancho San Juan Areas of Development Concentration Development Guidelines and Principles was therefore arbitrary and capricious and/or constituted a prejudicial abuse of discretion, in that the County failed to proceed in the manner required by the Planning and Zoning Law and adopted findings of General Plan consistency that are not supported by the evidence.

### Count Thirteen – Zone Changes Not Consistent With Adequate General Plan

154.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

155.    The Planning and Zoning Law requires that zoning ordinances be consistent with a valid, current, internally consistent General Plan.

156.    At the time of the County's approvals of the Revised Project and related General Plan and Area Plan amendments challenged herein, the Monterey County General Plan was incomplete, internally inconsistent, out-of-date, and failed to comply with all applicable statutory criteria under the Planning and Zoning Law.

157.    In approving the Revised Project, the County adopted changes to the Monterey County zoning ordinances that implement land use changes specified in the unlawfully adopted General Plan amendments.

158.    These zoning changes are inconsistent with the goals, policies, and implementation plans in the County General Plan, including those concerning land use, agriculture, transportation, growth, water, open space, conservation, and safety.

159.    The zoning changes further directly implicate the inadequacies of the County General Plan.

160.    The County's action in adopting these zoning changes was therefore arbitrary and capricious and/or constituted a prejudicial abuse of discretion, in that the County failed to proceed in the manner required by the Planning and Zoning Law and adopted findings of General Plan consistency that are not supported by the evidence.

DEC-08-2005 16:57        MO. CO. COUNSEL                    831 771 0595   P.05/16
                         UNE L    OAKLAND-SOP
                                       (FAX)510 8   8884              P. 027/042

## Count Fourteen – Specific Plan Not Consistent With Adequate General Plan

161.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

162.   The Planning and Zoning Law requires that a specific plan be consistent with a valid, current, internally consistent General Plan.

163.   At the time of the County's approvals of the Revised Project and related General Plan and Area Plan amendments challenged herein, the Monterey County General Plan was incomplete, internally inconsistent, out-of-date, and failed to comply with all applicable statutory criteria under the State Planning and Zoning Law.

164.   In approving the Revised Project, the County adopted the Revised Specific Plan.

165.   The Revised Specific Plan is inconsistent with the goals, policies, and implementation plans in the County General Plan and the Greater Salinas Area Plan, including those concerning land use, agriculture, transportation, growth, water, open space, conservation, and safety.

166.   The County's adoption of the Revised Specific Plan further directly implicates the inadequacies of the County General Plan.

167.   The County's action in adopting the Revised Specific Plan was therefore arbitrary and capricious and/or constituted a prejudicial abuse of discretion, in that the County failed to proceed in the manner required by the Planning and Zoning Law and adopted findings of General Plan consistency that are not supported by the evidence.

## THIRD CLAIM FOR RELIEF

### (Water Supply – Violation of SB 610, SB 221, and CEQA)

168.   Petitioners here incorporate by reference the preceding paragraphs in their entirety.

169.   Under the provisions of Senate Bill 610 ("SB 610"), a lead agency is required to prepare or obtain a water supply assessment ("WSA") for large projects and to include this assessment in the CEQA document prepared for the project.  Pub. Resources Code § 21151.9; Water Code §§ 10911(b), 10912(a).

170.   The water supply assessment and any plans for additional supplies must be included in the EIR.  Water Code § 10911(b).

171.   Senate Bill 221 ("SB 221") prohibits approval of a residential subdivision over 500 units unless there is written verification that a sufficient water supply is or will be available.  Business and Profession Code § 11010(a); Gov. Code §§ 65867.5(c), 66473.7(b).  SB 221 contemplates using the SB 610 water supply assessment as a means of meeting the requirement that a city have a written verification of a sufficient water supply before approving a project.  Gov. Code § 66473.7(c).

172.   The Revised Project would be subject to these requirements because it includes more than 500 residential units and requires subdivision approval.  Water Code § 10912(a); Gov. Code § 664737(a).

173.   The WSA projects demand for the Revised Project using unsupportable assumptions regarding average persons per residence and average demand per person.  Had proper assumptions been used, the WSA would have projected substantially more water usage.  Therefore, the conclusion that the Revised Project will result in a positive on-site "water balance" for the Project site is not supported by substantial evidence.

174.   The WSA improperly concludes with no substantial evidence that water demand for the Revised Project was included in California Water Service Company's previous demand forecast.

175.   The WSA fails to meet the SB 610 requirement that a water supply assessment provide "a description of the quantities of water received in prior years by the public water system . . . under the existing water supply entitlements, water rights, or water service contracts" as required by Water Code, § 10910(d)(1) because the WSA fails to provide this information for the CWSC system as a whole, which will be interconnected with the water supply for the Revised Project.

176.   Where a project depends on groundwater, SB 610 requires that the water supply assessment provide "a detailed description of the amount and location of groundwater pumped by the public water system . . . for the past five years."  Water Code, § 10910(f)(3).  The WSA entirely fails to provide this information for its overall groundwater supply, including the supply pumped from areas outside the Revised Project area which will be used to support the Revised Project demand.  Furthermore, the information it does provide regarding the Butterfly Village on-site wells is not "detailed."

177.   SB 610 requires that a water supply assessment provide information about "contracts and other proof of entitlement to an identified water supply."  Water Code, § 10910(d)(2)(A).  Although the

1   WSA states that H-Y-H Corporation has correlative beneficial use rights to groundwater under its site, it
2   provides no discussion of entitlements to the rest of CWSC's water sources from areas outside the
3   Revised Project area, upon which the Revised Project will depend.

4       178.    Neither the WSA nor the Addendum discuss whether the existing and planned groundwater
5   uses are reasonable, beneficial uses of the common resource or whether CWSC will be able to continue
6   to use it. Because a groundwater basin adjudication has begun and the WSA admits that CWSC may no
7   longer be able to control use of groundwater, there is no substantial evidence to support the conclusion
8   that existing water supplies will continue to be available. There is substantial evidence that existing
9   water supplies may not continue to be available.

10      179.    SB 610 requires that a water supply assessment provide "copies of a capital outlay program
11  for financing the delivery of a water supply that has been adopted by the public water system" from
12  existing sources. Water Code, § 10910(d)(2)(B). The WSA does not provide information about the
13  adopted capital outlay program to finance the necessary water supply system. In fact, WSA admits that
14  a capital outlay program has *not* been adopted, because it states that the capital costs are the
15  developer's responsibility and not part of CWSC's capital plan.

16   .  180.    SB 610 requires with reference to existing sources that a water supply assessment provide
17  information about necessary regulatory approvals to convey or deliver water supply. Water Code, §
18  10910(d)(2)(D). The WSA does not identify these approvals and merely states that CWSC "is familiar"
19  with them.

20      181.    SB 610 requires that a water supply assessment that predicts a shortage must include plans
21  for acquiring additional water supplies, including estimated costs, permits and approvals, and the time
22  frame for implementation. Water Code § 10911(a). This information must be included in the CEQA
23  document. Water Code § 10911(b). SB 221 requires that when a written verification of an adequate
24  water supply relies on projected water supplies not yet available, it must be based on written contracts or
25  proof of entitlements, copies of an adopted capital outlay program for financing delivery, securing
26  applicable permits for delivery infrastructure, and regulatory approvals for conveyance. Government
27  Code § 66473.7(d). The WSA acknowledges that existing supplies are inadequate to support maximum
28  daily demand, even under normal conditions. However, in response to the admitted inadequacy of

DEC-08-2005  16:58        MP. CO. COUNSEL                    831 771 0595    P.08/16
                                                   (FAX)510 ⬤ 0084       P. 030/042

1    existing supplies, the WSA offers nothing more than a promise to conduct a "feasibility study to develop

2    a long-term supply plan." To address the short and medium term shortfall, the WSA proposes to assess

3    the feasibility of more well drilling, despite the pending groundwater basin adjudication intended to

4    prevent continued overdrafting. To address the long term shortfall, the WSA proposes to conduct a

5    feasibility study to evaluate seven alternatives, only one of which has apparently even been the subject

6    of any actual planning effort. These alternatives also call for continued well drilling, despite the pending

7    groundwater basin adjudication intended to prevent continued overdrafting. The only proposal other

8    than continued reliance on groundwater is for diversion of the Salinas River, a project that has been

9    found to be entirely uncertain due to environmental objections, lack of funding, and court challenges.

10    Only one of the alternatives has been the subject of any actual planning or environmental review: the

11    rest of the alternatives are entirely speculative. Thus, the WSA does not provide the information

12    required by SB 610 and SB 221 about these proposed additional supply sources, including the estimated

13    costs, permits and approvals, and the time frame for implementation required by Water Code §

14    10911(a). Nor does the WSA provide the written contracts and proofs of water rights, copies of capital

15    outlay program for financing the water supply, securing governmental permits for infrastructure, and

16    any necessary regulatory approvals required by Gov. Code § 66473.7(d). This omission is not surprising

17    since the projects are admittedly only in the "feasibility study" stage.

18       182.    Because the WSA fails to present essential information that is statutorily required under SB

19    610 and SB 221, and because its projection of both demand and supply are unsupported, the WSA

20    cannot support a determination that there is an adequate water supply for the Revised Project. The

21    conclusion in the WSA that the water supply will be adequate is founded on wishful thinking, not the

22    substantial evidence required under SB 610, SB 221, and CEQA. Most notably, the WSA simply does

23    not present any credible evidence that essential additional supplies can be developed in light of basin

24    overdrafting and other environmental constraints.

25       183.    In approving the Revised Project without preparing an adequate water supply assessment, the

26    County prejudicially abused its discretion by failing to proceed in the manner required by SB 610, SB

27    221, and CEQA, and by adopting findings that are not supported by the evidence.

28

184.    Although the WSA prepared by CWSC stated that the water supply for the Revised Project is adequate, the County failed to make findings to that effect in the Addendum or elsewhere.  In failing to make such a finding the County prejudicially abused its discretion by failing to proceed in the manner required by SB 610, SB 221, and CEQA.

185.    A CEQA document is invalid if it fails to include in the project description offsite facilities that are implicit in the project.  *Santiago County Water District v. County of Orange* (1981) 118 Cal.App.3d 818, 829-830 (omission of required water delivery facilities invalidates EIR); *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 729-734 (EIR invalid for failure to describe and analyze wastewater treatment plant.)  Neither the FEIR nor the Addendum includes in the project description the additional water supply projects identified in the WSA.  The County therefore prejudicially abused its discretion in certifying the Addendum and failing to prepare a subsequent or supplemental EIR, by failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by the evidence.

186.    A CEQA document is invalid if it fails to evaluate the impacts of the construction of necessary additional water supplies.  *Santiago County Water Dist., supra* 118 Cal.App.3d 818 (EIR may not defer description of environmental effects of constructing essential water supply facilities); *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 (EIR may not defer analysis of impacts of providing water supply).  Neither the Addendum nor the WSA describes or contains an evaluation of the impacts of the additional supply sources identified as essential to a finding that the project has an adequate and reliable water supply.  This omission is not surprising because, except for the now entirely uncertain Salinas Valley Water Project, no environmental review has been undertaken for these speculative projects, which are still in the "feasibility study" stage.  The County therefore prejudicially abused its discretion in certifying the Addendum and failing to prepare a subsequent or supplemental EIR, by failing to proceed in the manner required by CEQA, and by adopting findings that are not supported by the evidence.

187.    As the WSA and Addendum admit, the Revised Specific Plan will result in an increase in groundwater consumption from the site by 25 acre-feet per year compared to the estimated existing land uses.  Despite the admittedly overdrafted status of the groundwater basin, the Addendum incorrectly

1  concludes that taking even more water from the basin will not constitute a significant impact, either for

2  the Project individually, or for the Project taken together with cumulative conditions. The County

3  therefore prejudicially abused its discretion in certifying the Addendum and failing to prepare a

4  subsequent or supplemental EIR, by failing to proceed in the manner required by CEQA, and by

5  adopting findings that are not supported by the evidence.

6      188.    A Subsequent EIR is required if new information or changes to a project show new or more

7  severe impacts. The water supply assessment for the Initial Project showed that the Butterfly Village

8  project would improve the water balance at the site: the balance would be increased from +50 acre-

9  ft/year to +85 acre-ft/year, an increase of 35 acre-ft. The water supply assessment for the Revised

10  Project projected the Butterfly Village development would *diminish* the water supply by 25 acre-ft.

11  Either because of new information or changes in the Project, the water supply assessment now projects

12  that an impact previously found significant will be more severe. The water supply assessment also

13  demonstrates that the H-Y-H Project contributes to cumulative overdrafting, an admittedly significant

14  impact. Thus, a Subsequent EIR was required. The County therefore prejudicially abused its discretion

15  in certifying the Addendum and failing to prepare a subsequent or supplemental EIR, by failing to

16  proceed in the manner required by CEQA, and by adopting findings that are not supported by the

17  evidence.

18

19                        **FOURTH CLAIM FOR RELIEF**

20              (Violation of Election Code § 9145; General Plan Inconsistency)

20      189.    Petitioners here incorporate by reference the preceding paragraphs in their entirety.

21      190.    Election Code § 9145 requires that if the board of supervisors does not entirely repeal the

22  ordinance against which a referendum petition is filed, the board shall submit the ordinance to the

23  voters. The ordinance shall not become effective unless and until a majority of the voters voting on the

24  ordinance vote in favor of it.

25      191.    Most of General Plan and Greater Salinas Area Plan amendments essential to the Revised

26  Project were identical in wording to the amendments that were repealed by the November 8 referendum.

27  Others were substantially identical.

28

192.    Because the General Plan and Greater Salinas Area Plan amendments found essential to, and adopted in, the Revised Project had not and could not become effective as of November 7, 2005, the County could not act to approve the Revised Project on November 7, 2005.

193.    Because most of the voters of the County acted to repeal the General Plan and Greater Salinas Area Plan amendments essential to the Revised Project on November 8, 2005, the Revised Project is not consistent with a validly adopted General Plan. The County therefore prejudicially abused its discretion in approving the Revised Project, by failing to proceed in the manner required by the Elections Code and the Planning and Zoning Law, and by adopting findings that are not supported by the evidence.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

194.    This action is brought consistent with the requirements of Public Resources Code section 21177 and Code of Civil Procedure 1094.5. Petitioners objected to the County's approval of the Revised Project orally or in writing prior to the close of the public hearing on the project before the issuance of the Notice of Determination. Petitioners and/or other agencies and individuals raised the legal deficiencies asserted in this petition orally or in writing prior to the close of the public hearing on the project before the issuance of the Notice of Determination.

195.    Petitioners are not obliged to exhaust administrative remedies because the County relied on an addendum process and because the foreshortened opportunities for review precluded opportunity for members of the public to raise objections. *Santa Teresa Citizen Action Group et al. v. City of San Jose et al.* (2003) 114 Cal.App.4th 689, 701-702; Pub. Resources Code § 21177(e).

196.    Petitioners have performed all conditions precedent to filing this action by complying with the requirements of Public Resources Code section 21167.5 in serving notice of the commencement of this action January 13, 2005.

## INADEQUATE REMEDY AT LAW

197.    Petitioners declare that they have no plain, speedy, and adequate remedy in the ordinary course of law for the improper action of the County.

DEC-08-2005  16:59      MD. CO. COUNSEL          831 771 0595    P.12/16
                        OAKLAND SUP         (FAX)510-    0084       P. 034/042

## NECESSITY FOR GRANTING STAY OF COUNTY'S APPROVAL

198.    Under Code of Civil Procedure section 1094.5(g), this Court may issue a stay order during the pendency of the proceedings unless it is satisfied that a stay would be against the public interest.

199.    If construction of the Revised Project is allowed to commence prior to the Court's final judgment on the merits, Petitioners and the environment will be permanently and irreparably injured from the resulting unmitigated environmental, aesthetic, recreational, and land use impacts.

200.    Imposition of a stay would not be against the public interest in that the public will derive no benefit from the commencement of project construction prior to the Court's final judgment.

## NEWLY PRODUCED EVIDENCE

201.    In accord with Code of Civil Procedure section 1094.5(e), Petitioners may, prior to or during the hearing on this petition, offer additional relevant evidence that could not, in the exercise of reasonable diligence, have been produced at the administrative hearing.

## ATTORNEYS' FEES

202.    Petitioners are entitled to recover attorneys' fees as provided in Government Code section 800 if they prevail in this action and the Court finds the County's action was the result of arbitrary and capricious action.  Petitioners are further entitled to recover attorneys' fees as provided in Code of Civil Procedure section 1021.5 if they prevail in this action and the Court finds that a significant benefit has been conferred on the general public or a large class of persons, and that the necessity and burden of private enforcement is such as to make an award of fees appropriate.

## PRAYER

WHEREFORE, Petitioners pray for entry of judgment as follows:

1.      For a peremptory writ of mandate directing the County:

(a)     to set aside its November 7, 2005 action certifying an EIR Addendum for the Revised Project;

(b)     to set aside its November 7, 2005 action approving Revised Project-related amendments to the County General Plan and Greater Salinas Area Plan;

(c)     to set aside its November 7, 2005 action approving the revised Rancho San Juan Specific Plan and zoning changes for the Revised Project;

Petition for Writ of Mandate & Complaint
For Declaratory & Injunctive Relief

1     (d)    to refrain from granting any additional permits, entitlements, or other approvals related to

2 the Revised Project to H-Y-H until the County has taken action necessary to bring its approval into

3 compliance with CEQA, the Planning and Zoning Law, SB 610, SB 221, and the County Code;

4     (e)    to comply with CEQA in any subsequent action or actions taken to approve the Project.

5     (f)    to bring its General Plan into compliance with all applicable provisions of Government

6 Code section 65300, et seq. within 120 days.

7     2.    For an order staying the effect of the County's actions pending the outcome of this

8 proceeding.

9     3.    For a preliminary and permanent injunction directing the County and H-Y-H to cease and

10 refrain from engaging in any action related to the Revised Project that could result in any change or

11 alteration in the physical environment until the County takes any necessary action to bring its action into

12 compliance with CEQA, the Planning and Zoning Law, SB 610, SB 221, and the County Code.

13     4.    For their costs of suit.

14     5.    For an award of attorneys' fees.

15     6.    For other legal or equitable relief that the Court deems just and proper.

16

17 Dated: December 7, 2005

18                      Respectfully submitted,

19                      M. R. WOLFE AND ASSOCIATES

20

21                      By:

22                          Mark R. Wolfe

23                          John H. Farrow

24                      Attorneys for Plaintiffs and Petitioners

25                      LANDWATCH MONTEREY COUNTY,

26                      and RANCHO SAN JUAN OPPOSITION
                       COALITON

27

28

## VERIFICATION

I, Mark R. Wolfe declare:

I am the Attorney for Petitioners LandWatch Monterey County and Rancho San Juan Opposition Coalition in the above-captioned action. I maintain my offices in the City and City of San Francisco. Petitioners are unable to make this verification because they are absent from the City and City of San Francisco.

I have read the foregoing PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I affirm, under penalty of perjury, that the foregoing is true and correct.

Dated: December 7, 2005

_____
Mark R. Wolfe

PETITION & COMPLAINT                    34