OFFICE OF THE MONTEREY COUNTY COUNSEL
CHARLES J. MCKEE (SBN 152458), COUNTY COUNSEL
LEROY W. BLANKENSHIP (SBN 065233), ASSISTANT COUNTY COUNSEL
EFREN N. IGLESIA (SBN 71309), SENIOR DEPUTY COUNTY COUNSEL
168 W. ALISAL, 3RD FLOOR
SALINAS, CA 93901-2680
Telephone: (831) 755-5045
Facsimile: (831) 755-5283

NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
STEPHEN N. ROBERTS (SBN 062538)
NICOLE A. TUTT (SBN 179244)
CIARAN O'SULLIVAN (SBN 198970)
50 CALIFORNIA STREET, 34TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-4799
Telephone: (415) 398-3600
Facsimile: (415) 398-2438
Email: montereycase@nossaman.com

NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
JOHN J. FLYNN III (SBN 076419)
18101 VON KARMAN AVENUE
IRVINE, CA 92612-0177
Telephone: (949) 833-7800
Facsimile: (949) 833-7878
Email: montereycase@nossaman.com

Attorneys for Defendants/Respondents
BOARD OF SUPERVISORS OF THE COUNTY OF MONTEREY;
TONY ANCHUNDO, IN HIS CAPACITY AS MONTEREY COUNTY
REGISTRAR OF VOTERS; AND THE COUNTY OF MONTEREY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RANCHO SAN JUAN OPPOSITION COALITION; CITIZENS FOR RESPONSIBLE GROWTH; AND JULIE ENGELL, <br><br> Plaintiffs, <br><br> vs. <br><br> BOARD OF SUPERVISORS OF THE COUNTY OF MONTEREY; TONY ANCHUNDO, IN HIS CAPACITY AS MONTEREY COUNTY REGISTRAR OF VOTERS; COUNTY OF MONTEREY; AND DOES 1 THROUGH 10, INCLUSIVE, <br><br> Defendants. | Case No.:   C 06-2369 JW <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:      To be submitted without hearing <br> Judge:     Hon. James Ware <br> Courtroom: 8 |

# TABLE OF CONTENTS

**(Page)**

I.  INTRODUCTORY STATEMENT ...................................................................1

II.  BACKGROUND.........................................................................................4

    A.  History of the Underlying Project and Relationship to the Referendum...................4

    B.  FVRA Litigation. ...............................................................................5

    C.  Election Timing Facts. .......................................................................7

III.  DISCUSSION:  THE REQUEST FOR A MANDATORY PRELIMINARY
    INJUNCTION SHOULD BE DENIED...........................................................8

    A.  Standards Applicable To Injunctive Relief. .........................................8

    B.  Plaintiffs Will Not Suffer Irreparable Harm By Denial Of This Motion;
    The Balance Of Hardships Favors The County Here. ..............................9

        1.  Voting On The Referendum In A Special Election, Even If
        Delayed By Up To A Year, Will Not Harm RSJOC...................9

        2.  The Butterfly Village Proponent Cannot Use The Stay To Start
        The Project........................................................................10

        3.  HYH's Right To Develop Butterfly Village Has Not Vested, And
        Will Not Vest Before The Referendum Issue Is Resolved. ..........11

        4.  RSJOC Should Have And Could Have, But Did Not, Move For
        An Injunction In Its Superior Court Writ Of Mandate Action. ......12

        5.  The Ninth Circuit Has Already Indicated That It Would Deny The
        Injunction That RSJOC Seeks. .............................................13

        6.  The Minority Voters Of Monterey County, The County Itself,
        And All Of The Taxpayers Of The County, May Suffer
        Irreparable And Unnecessary Harm If The Court Changes The
        Status Quo. .....................................................................13

    C.  The Likelihood That RSJOC Will Succeed On The Merits Is Entirely
    Speculative......................................................................................16

        1.  Section 203 Of The FVRA Must Be Broadly Construed To
        Require Translation Of A Referendum Petition Into Spanish In
        Monterey. ......................................................................16

        2.  Referendum Petitions, Forms And Associated Documents
        Constitute "Materials Or Information Relating To The Electoral

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS (cont'd)

**(Page)**

Process."................................................................................................17

    a)    A plain reading of section 203 requires that referendum petitions, forms and associated documents constitute "materials or information relating to the electoral process."................................................................................17

    b)    The legislative history of section 203 supports this conclusion................................................................................19

    c)    Deference should be accorded to the United States Attorney General's Interpretation of Section 203(c). ....................20

    d)    Ninth Circuit precedent requires that section 203 applies to petitions. ................................................................................21

    3.    The Referendum Petition And Associated Forms Are "Provided By" The State................................................................................22

    a)    Judge Collins' Decision does not provide guidance here................24

IV.    CONCLUSION ................................................................................24

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

<u>(Page)</u>

**Cases**

*Allen v. State Bd. Of Elections*

    393 U.S. 544 (1969) ............................................................................................ 17

*Amoco Prod. Co. v. Village of Gambell*

    480 U.S. 531 (1987) ............................................................................................ 16

*Avco Community Developers, Inc. v. South Coast Reg'l Comm'n*

    17 Cal.3d 785 (1976) .......................................................................................... 11

*Badillo v. Stockton*

    1988 U.S. Dist. Lexis 17601 at p. 24 (E.D.Cal. 1988) ...................................... 15

*Buckley v. Am. Constitutional Law Found.*

    525 U.S. 182 (1999) ............................................................................................ 14

*Casarez v. Val Verde County*

    957 F.Supp. 847 (W.D. Texas 1997) ................................................................. 15

Cf. *Pleasant Grove v. United States*

    479 U.S. 462 (1987) ............................................................................................ 20

*Dahl v. HEM Pharmaceuticals Corp.*

    7 F.3d 1399 (9th Cir. 1993) ................................................................................. 9

*Delgado  v. Smith*

    861 F.2d 1489 (11th Cir. 1988) .................................................................. 18, 20

*Elrod v. Burns*

    427 U.S. 347 (1976) ............................................................................................ 15

*Gilliland v. County of Los Angeles*

    126 Cal.App.3d 610 (1981) ................................................................................ 11

*Gomez v. City of Watsonville*

    863 F.2d 1407 (9th Cir. 1988) ........................................................................... 15

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES (cont'd)

**(Page)**

*Green v. City of Tucson*
340 F.3d 891 (9th Cir. 2003) ................................................................ 14

*Lopez v. Heckler*
713 F.2d 1432 (9th Cir. 1983) ........................................................... 8, 17

*Meyer v. Grant*
486 U.S. 414 (1988) ................................................................. 14, 18, 20

*Midway Orchards v. County of Butte*
220 Cal.App.3d 765 (1990) ................................................................ 11

*Myers v. Patterson*
196 Cal.App.3d 130 (1987) ................................................................ 23

*Padilla v. Lever*
429 F.3d 910 (9th Cir. 2005) ........................................................ passim

*Spears v. Stewart*
283 F.3d 992 (9th Cir. 2002) ............................................................. 22

*United States v. Berks County*
250 F.Supp.2d 525 (E.D. Pa. 2003) .................................................... 15

*United States v. Daas*
198 F.3d 1167 (9th Cir. 1999) ........................................................... 17

*United States v. Johnson*
256 F.3d 895 (9th Cir. 2001) ............................................................. 22

*United States v. Sheffield Bd. Of Comm'rs*
435 U.S. 110 (1978) ........................................................................ 20

*White v. E-Loan, Inc.*
409 F.Supp.2d 1183 (N.D. Cal. 2006) ................................................ 17

*Zaldivar v. City of Los Angeles*
780 F.2d 823 (9th Cir. 1986) ............................................... 18, 21, 22, 25

# TABLE OF AUTHORITIES (cont'd)

<u>(Page)</u>

**Statutes**

28 C.F.R. § 55 ........................................................................................................ 16

28 C.F.R. § 55.19 ................................................................................................... 18

29 C.F.R. § 55.15 ................................................................................................... 21

41 U.S.C. § 1973 ................................................................................................... 18

42 U.S.C. § 1973 ............................................................................................... 16, 17

Cal. Elec. Code § 9020 .......................................................................................... 23

Cal. Elec. Code § 9101 .......................................................................................... 23

Cal. Elec. Code § 9113 .......................................................................................... 23

Cal. Elec. Code § 9115 .......................................................................................... 23

Cal. Elec. Code § 9140 .......................................................................................... 22

Cal. Elec. Code § 9141 .......................................................................................... 23

Cal. Elec. Code § 9144 ..................................................................................... 20, 23

Cal. Elec. Code § 9146 ..................................................................................... 22, 23

Cal. Elec. Code § 9147 ..................................................................................... 18, 23

Cal. Elec. Code § 9160 .......................................................................................... 23

Federal Voting Rights Act of 1964, § 203 ..................................................... passim

Gov. Code § 65864 ................................................................................................ 11

Gov. Code § 65920 ................................................................................................ 11

Gov. Code § 66498.1 ............................................................................................. 11

**Other Authorities**

*Merriam Webster's Collegiate Dictionary*, at 458 (10th ed. 1996) ....................... 18

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES (cont'd)

**(Page)**

**Treatises**

13 Coquillette, D. et al., Moore's Federal Practice, § 65.04 ................................................................ 9, 15

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTORY STATEMENT

As was true in the prior case before this Court, *In re Monterey County Initiative Matter*, No. C 06-01407 JW (N.D. Cal. 2006), the Monterey County Board of Supervisors (the "Board") has a Hobson's Choice between the demands of both sets of plaintiffs in these related cases: Sabas Rangel and Maria Buell (collectively "Rangel") sue the Board for violating § 203 of the Federal Voting Rights Act of 1964 as amended ("FVRA"), by allowing the Referendum petition at issue here ("Petition") to be placed on the ballot despite being circulated in English only; and Rancho San Juan Opposition Coalition ("RSJOC"), Citizens for Responsible Government, and Julie Engell (collectively "RSJOC," unless otherwise specified) sue the Board for having removed the same Referendum from the ballot after the Board determined that the circulation of the petition violated FVRA.

In this *Referendum* matter, however, the Board faces an additional dilemma: the Board was compelled to adopt the General Plan amendments that the Referendum here seeks to overturn because of a 2001 Superior Court Order in a suit brought by H-Y-H Corporation ("HYH"), the Rancho San Juan property owner and developer, which Order required the County to adopt a Specific Plan (necessitating General Plan amendments) that would permit development in the Rancho San Juan area. Each day that the County delays in adopting a Specific Plan increases the danger of the County being held in contempt by the Superior Court, and increases the potential damages claim that the County will be exposed to for failing to implement those changes. In other words, changing the status quo here, especially at a time when the Ninth Circuit is soon to provide guidance on the applicable law, may not only unnecessarily and irreparably tread upon the rights of minority language voters of Monterey, and require the County to conduct at public expense an election that the Ninth Circuit's ruling may render invalid, but it could also unnecessarily interfere with the County's ability to meet its regulatory land use obligations as determined by the State Court. That could impose enormous costs on the County. Given that RSJOC's motion is based entirely on the *mere possibility* that the Ninth Circuit will change the law as it wishes, the applicable law of mandatory preliminary injunctions does not require the imposition of that harm on minority voters or the County.

When the Board concluded that the Referendum petition violated the FVRA, and removed it from the June 2006 ballot, it followed the plain language of FVRA, the regulations promulgated

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  thereunder by the Department of Justice ("DOJ"), the then applicable Ninth Circuit's decision relating to

2  petitions in *Padilla v. Lever*, 429 F.3d 910 (9th Cir. 2005) ("*Padilla*"), and the decision of this Court in

3  the *In re Monterey County Initiative Matter*, which held that initiative petitions were subject to FVRA.

4  In doing so, it was motivated by a concern that the rights of the Spanish-speaking residents of Monterey

5  County were being harmed by the petition proponents, a fact highlighted for the Board not only by those

6  court decisions but also Rangel's filing of one of the instant lawsuits.

7       The Ninth Circuit presumably decided to consider the *Padilla* ruling *en banc* because of the

8  importance of the issues raised to elections officers and local governments throughout the Circuit; its

9  hearing does not necessarily mean it will reverse the prior decsion.  The County does not know what the

10  Ninth Circuit will do and proceeds on the assumption that the *en banc* panel will decide the matter with

11  an open mind.  In contrast, RSJOC's motion rests ***entirely on the assumption*** that the *en banc* panel will

12  necessarily reverse the original *Padilla* ruling, an argument that hardly meets the standard for showing a

13  likelihood of success on the merits.  Essentially RSJOC asks this Court to predict that the *en banc* panel

14  will rule as RSSOC wishes, ignoring the consequences of an incorrect prognostication:  a potentially

15  divisive referendum that violates the rights of minority voters, at a cost to the taxpayers of Monterey that

16  may not have been necessary.

17       RSJOC would not be harmed in any manner by the denial of emergency injunctive relief.  In

18  contrast, with that denial the Board and this Court will be able to have the benefit of the *en banc* panel's

19  full consideration of the applicability of the FVRA to petitions before having to take action, and the

20  danger of depriving the minority voters of their rights under the FVRA will be obviated.  It is entirely

21  possible that the Ninth Circuit will issue its ruling in time for the Board to put the referendum on the

22  November 2006 ballot should the Ninth Circuit determine that FVRA is not applicable to petitions.[1]

23  Even if it does not issue its ruling very soon, but subsequently rules as RSJOC wishes, the Board can

24  place the referendum on a special election ballot, at an expense that is not significant when compared to

25  the expense to all parties of campaigning for or against, defending, attempting to overturn, or conducting

26

27

28  [1] In the Governor Gray Davis recall matter, a case having similarly important implications for electoral
procedures in California, the Ninth Circuit handed down a decision after an *en banc* hearing within a
day.  *See Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914 (2003).

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    anew a possibly invalid election, and especially when compared to the possible irreparable harm

2    imposed on the minority voters of Monterey County.  The only consequence to Plaintiffs, a minor delay,

3    would not constitute cognizable harm in the injunction context.

4           The Referendum at issue is intended to put a halt to a development project in the Rancho San

5    Juan area to which Plaintiffs are opposed (the "Butterfly Village project").  As will be explained below,

6    it appears there is no danger that the project in question will commence before the Ninth Circuit rules on

7    *Padilla*, or even that the developer's right to commence will vest before that time.  That project has been

8    in litigation for years, and the developers are hundreds of conditions away from approval of the project.

9    The injunction is not necessary to prevent the commencement of the project.  If for some unforeseen

10   reason that possibility does become real, there would be ample time to consider a preliminary injunction

11   then.  RSJOC is, furthermore, involved in no less than two state court actions concerning Butterfly

12   Village, in which actions it could have sought an injunction based on the alleged uncertainty as to the

13   County's approval of that project.  But knowing it has no grounds there for such an injunction, it chose

14   this forum *and this time* to seek an injunction solely because of some *temporary* uncertainty surrounding

15   the applicability of section 203.  RSJOC is simply trying to use this Court to obtain advantage in its

16   political campaign in Monterey.

17          Finally, *the Ninth Circuit has already effectively provided guidance to this Court* on the

18   preliminary injunction issue.  When the losing plaintiffs appealed this Court's ruling in the *In re*

19   *Monterey County Initiative Matter*, and sought an emergency injunction pending appeal from the Ninth

20   Circuit to force the initiative election, the Circuit <u>denied</u> the request for injunctive relief.  The Ninth

21   Circuit was not persuaded by the plaintiffs' assertions of irreparable harm, and did not order the

22   initiative back on the ballot.  Instead, the Circuit ordered the appeal, which concerned the applicability

23   of the FVRA to *initiative* petitions, stayed pending the Circuit's *en banc* ruling in *Padilla*.  The proper

24   course here, too, is to stay resolution of this *referendum* petition case until the *Padilla* panel ruling.

25          The mandatory injunction should be denied, and the status quo retained.

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

II.    **BACKGROUND**

2

A.    **History of the Underlying Project and Relationship to the Referendum.**

3       The County of Monterey (the "County") and the Board have been involved for years in litigation

4  with on the one hand developer HYH, and on the other hand citizen groups opposed to development in

5  the Rancho San Juan area, such as Landwatch Monterey County ("Landwatch") and RSJOC, one of the

6  moving parties here. *See Declaration of Alana Knaster in Opposition to Motion for Preliminary*

7  *Injunction* ("Knaster Dec."), ¶ 3.  In the first such piece of litigation HYH sued the County on, among

8  other things, constitutional "takings" grounds.  Landwatch and RSJOC have also sued the County in two

9  lawsuits for a Writ of Mandate in the Superior Court, on numerous grounds related to the same project,

10  including but not limited to alleged violations of the California Environmental Quality Act ("CEQA"),

11  Pub. Res. Code 21000, *et seq.*  HYH is the real party in interest in that litigation.  *Id.* at ¶ 5, Exs. D, E.

12       After a trial of HYH's original action, the Superior Court of Monterey ordered the County, on

13  February 26, 2001, to adopt a specific plan, an EIR, and zoning for the Rancho San Juan Area of

14  Development Concentration.  Although the Court's Order did not specifically require the County to

15  approve HYH's project, such zoning and plan changes were necessary prerequisites to permitting HYH

16  to develop the property it owned in that area.  *Id.* at ¶ 4, Exs. B, C.

17       Pursuant to a stipulation with HYH reached after mediation, in order to avoid years of further

18  litigation with HYH over its right to proceed with the Butterfly Village project, the County agreed not

19  only to process the plan and zoning changes expeditiously to comply with the court's judgment, but also

20  to process the Project concurrently.  Shortly thereafter the County became defendants in no less than

21  five additional lawsuits concerning the development, including the above-referenced CEQA action by

22  Landwatch and RSJOC, currently pending in Monterey County Superior Court.  *Id.* at ¶ 5, Exs. D, E.

23       On December 14, 2004 the County adopted certain amendments to the General Plan, and adopted

24  a Specific plan and zoning which would have placed it in compliance with the state court's order and

25  judgment, and which provided for approximately 2,600 acres of development in the Rancho San Juan

26  area.  Shortly thereafter Landwatch and RSJOC sponsored a referendum to defeat the amendments to the

27  General Plan, which passed in the November 2005 election.  *Id.* at ¶ 6.  The passage of that referendum

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   thereby repealed the amendments effected by the County to place it in compliance with the state court's

2   order.

3         In light of that repeal, and in order to try to place itself in compliance with the state court's order

4   and to avoid a potentially huge damages claim against the County by HYH, the Board of Supervisors

5   (the "Board") again attempted to amend the relevant General plan provisions, this time in a much more

6   scaled-down manner. *Id.* at ¶ 7.  On November 7, 2005, the Board passed Resolution No. 05-305 (the

7   "Resolution") adopting revised amendments to the general and area plans for the Rancho San Juan area.

8   *Id.*, Exs. F, G.  The revised development would now amount to approximately 671 acres. *Id.*  This is

9   probably the minimum necessary for the County to comply with the 2001 state court order and avoid

10  damages claims from HYH.

11        Shortly thereafter, RSJOC sponsored the referendum at issue in this case (the "Referendum") to

12  repeal the Resolution, and this Referendum qualified for the June 2006 ballot.  It was ordered placed on

13  that ballot by the Board on January 24, 2006.  *Id.* at ¶ 8.

14      **B.**    **FVRA Litigation.**

15        In the meantime events occurred which caused the Board to reconsider its decision to put the

16  Referendum on the ballot.  The application of the FVRA to initiative and referendum petition circulation

17  had been raised by two lawsuits filed against the County. *See* Declaration of Leroy Blankenship in

18  Opposition to Motion for Preliminary Injunction ("Blankenship Dec."), ¶¶ 4, 5.  The first of those

19  actions was the *In re Monterey County Initiative Matter*, wherein plaintiffs Rosario Madrigal, along with

20  plaintiffs herein Rangel and Buell, sued the County for allowing an initiative petition to be placed on the

21  ballot after it had been circulated in English only.  *Id.* at ¶ 4.  On March 23, 2006, this Court ruled that

22  the initiative petition had indeed violated the FVRA.  *Id.*  Additionally, on March 27, 2006, in one of the

23  cases now related herein, Rangel sued the County for allowing the Referendum on the same ballot,

24  because the Referendum petition had similarly been circulated only in English.  *Id.* at ¶ 5.  In light of the

25  controlling law, including this Court's ruling in the prior matter, the County concluded that it ran the

26  risk of being held in violation of the FVRA with respect to the referendum as well.  On March 28, 2006,

27  the Board ordered the referendum removed from the ballot as well.  *Id.* at ¶ 6.  On April 3, 2006, RSJOC

28  sued the County in state court, which lawsuit the County subsequently removed to this Court on April 4,

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   2006, and which was subsequently ordered related by this Court to that of Mr. Rangel. *Id.* at ¶ 7. The

2   case has languished for the three intervening months, no action being taken by Plaintiffs to obtain a

3   ruling from the Court until now. *Id.* at ¶ 8.

4         On April 20, 2006, the Ninth Circuit granted the motion of the losing defendants/respondents in

5   *Padilla* for an *en banc* consideration the panel ruling.  Although the original *Padilla* decision has not

6   been citeable precedent since that date, Plaintiffs did nothing further in this case until they filed the

7   present motion for injunctive relief on July 3, 2006. *Id.*

8         Passage of the Referendum repealing the Resolution, and hence the changes to the amendments

9   to the general and area plans, would undoubtedly have placed the County again in violation of the state

10  court order mandating the adoption of a specific plan that will permit the development in the Rancho

11  San Juan area, and possibly in contempt of court.  Accordingly, on March 13, 2006, the County had

12  moved in the state court action with HYH, in the form of a Motion for Judgment on the Pleadings, for

13  declaratory relief as to whether the Referendum, if it passed, would take precedence over the state court

14  order, or whether the state court order is the higher authority and the Referendum must yield to it.

15  *Knaster Dec.*, ¶ 9 Ex. H.  After the Board removed the Referendum from the June ballot on March 28,

16  2006, the County and HYH stipulated to stay that declaratory relief proceeding until the validity of the

17  Referendum was determined, resolution of the declaratory relief issue no longer being immediately

18  necessary. *Id.* at ¶ 9, Ex. I.

19        Landwatch and RSJOC, as noted above, have sought a Writ of Mandate in the Superior Court on

20  CEQA grounds to stop the Butterfly Village project.  To date they have not filed any request for an

21  injunction in that matter. *Id.* at ¶ 10.

22        Because of the numerous delays in adopting a Specific Plan necessary to authorize the HYH

23  project,[2] and the uncertainty surrounding the legality of the Resolution and the Referendum, HYH has

24  yet to commence compliance with a total of 263 conditions of approval imposed by the Board, or to

25  commence obtaining a myriad of permits and approvals from many other agencies that will be necessary

26

27  _____

28  [2] Those delays were described in the state court's March, 2001, Statement of Decision at that time as
over 14 years, and which by 2006 now amount to over 20 years. *Knaster Dec.*, Ex. H, at p. 6.

1   before it will be allowed to "turn dirt" on the Rancho San Juan project. *Knaster Dec.*, ¶ 11, Ex. J.  Given

2   the time-periods normally required to satisfy those conditions and to process and obtain those permits

3   and approvals, it is almost impossible, even if the Referendum were passed by voters this coming

4   November and HYH immediately commenced work on meeting the above-referenced conditions, that

5   HYH could commence any work to develop the Butterfly Village project in less than one or probably

6   even one and one-half years. *Id.* at ¶ 11.

7           **C.      Election Timing Facts.**

8           The next regularly-scheduled election in Monterey County will take place on November 7, 2006.

9   *Blankenship Dec.*, at ¶ 9.  In order adequately to prepare the voting materials required by placing another

10  measure of any kind on that ballot, including the voter information pamphlets, ballot forms, and other

11  materials necessary for this Referendum petition, the decision to place the Referendum on the ballot

12  would have to be made August 28, 2006, at the latest.<u>3</u>  If the *en banc Padilla* panel rules that Section

13  203 of the Voting Rights Act does not require petitions to be circulated in minority languages, and if that

14  ruling becomes available before August 28th, the Referendum can be placed on the upcoming

15  November 7, 2006 ballot.  If such an *en banc* panel ruling is issued after August 28th, the Board of

16  Supervisors can conduct a special election on the Referendum.  *Id.* at ¶¶ 9, 10.

17          If this Court orders the County to place the Referendum on the upcoming November general

18  election, the additional incremental financial costs thereby imposed on the County will be approximately

19  $50,000.  These are costs that the County will have incurred unnecessarily if it is ultimately determined

20  that the Referendum petition was circulated in violation of Section 203 of the Voting Rights Act.  This

21  does not, of course, take into account the financial and non-financial costs that will inevitably be

22  incurred by private parties on both sides of the issues during what will undoubtedly be a divisive

23  election campaign.  *Id.* at ¶ 11.

24

25  _____

26  <u>3</u> At the time of the telephone hearing setting this briefing schedule, counsel for the County indicated
    that in the normal course a decision is needed approximately 88 days before an election, which would
27  have put the deadline in early August.  After consultation with the elections department, it has been
    determined that the County could get the matter on the ballot were there a decision to do so as late as
28  August 28.  Such a late decision would require some rushed work, but it could be done.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

It is possible that there will be regularly-scheduled elections held in Monterey County in 2007, although there are none scheduled as of today's date. Elections Code Section 1000 prescribes three "established" election dates in any odd-numbered year: the first Tuesday after the first Monday in March, the first Tuesday after the first Monday in June, and the first Monday after the first Tuesday in November. Section 1400 of the Elections Code requires that special elections be held on the established election dates. If it becomes necessary to conduct a special election solely for the Referendum, the election could be held as early as March 6, 2007. *Id.* at ¶ 12.

## III.   DISCUSSION:  THE REQUEST FOR A MANDATORY PRELIMINARY INJUNCTION SHOULD BE DENIED

The request for preliminary injunctive relief should be denied.  Under the applicable Ninth Circuit standards for mandatory injunctive relief, the motion has no merit.

Even assuming the Ninth Circuit ultimately decides in the *Padilla* case that petitions are not subject to FVRA, there will be no irreparable harm to plaintiffs if the decision as to whether to hold an election in this case is postponed until the Ninth Circuit rules.  Further, if the election goes forward but the Ninth Circuit ultimately determines that petitions are subject to FVRA, the defendant and the public will have been harmed by granting the motion because an illegal election on a divisive issue will have been held at large expense to the county and the proponents and opponents of the measure.

Also, there are strong legal reasons to find that referendum petitions are subject to FVRA. Referendum petitions constitute election or other materials provided by the state within the meaning of FVRA. The Board acted correctly in removing the referendum from the ballot as the petition had not been circulated properly under FVRA.

### A.   Standards Applicable To Injunctive Relief.

In the Ninth Circuit there are two interrelated legal tests for the issuance of a preliminary injunction. These tests are "not separate" but rather represent "the outer reaches 'of a single continuum.'" *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983). At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury; at the other end the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor. *Id.* The relative hardship to the parties

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    and the public interest are the critical elements in deciding at which point along the continuum a stay or

2    injunction is warranted. *Id.*

3          Because the purpose of a preliminary injunction is to preserve the status quo pending trial (see 13

4    Coquillette, D. et al., Moore's *Federal Practice*, § 65.04[1]), for "affirmative" or "mandatory"

5    injunctions that alter the status quo rather than simply preserve it, many courts hold the party seeking the

6    injunction to the higher standard of showing a "clear" or "substantial" likelihood of success  That is true

7    in the Ninth Circuit; see, *e.g., Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993)

8    ("Such mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless

9    the facts and law clearly favor the moving party").

10         **B.    Plaintiffs Will Not Suffer Irreparable Harm By Denial Of This Motion; The Balance
                 Of Hardships Favors The County Here.**

11

12         It is significant that of RSJOC's twenty-three (23) pages of briefing on this injunction motion, it

13   devotes a scant three (3) pages to an analysis of the balance of the hardships to the parties.  That is

14   because its entire demand for relief here can be boiled down to its belief that *Padilla* was wrongly

15   decided, that any court that relied on it for authority in any context other than that of recall petitions was

16   wrong, that any local government that relied on it was also wrong and was probably acting nefariously,

17   and that the Ninth Circuit is certain to reverse it.  Even if that were completely correct, it is insufficient

18   to warrant a mandatory injunction, where an essential prerequisite for relief is the probability of

19   irreparable harm to the moving party.  RSJOC can demonstrate none.

20         **1.    Voting On The Referendum In A Special Election, Even If Delayed By Up To
                 A Year, Will Not Harm RSJOC.**

21         RSJOC posits that if the Referendum does not make it to the November ballot, and it transpires

22   that the *Padilla en banc* ruling goes its way, it will be two years before the measure can be voted on.

23   That is incorrect.  Even if the Ninth Circuit rules too late to allow the Referendum on the November

24   ballot, it is quite possible and even probable that the special election on the Referendum could be held as

25   soon as March 6, 2007. *Blankenship Dec.*, ¶ 12.  And there are two other dates in November of 2007 on

26   which the special election could be held, in June and in November. *Id.*

27         As RSJOC concedes, its claim of irreparable harm is based on the *possibility* that the Butterfly

28   Village project may proceed during the stay caused by the Board's action in removing the Referendum.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    *See RSJOC MPA*, at 20:15-18.  But that is simply not correct.  Because of the uncertainty as to its right

2    to proceed caused by the Referendum, HYH has yet to commence the enormous process of obtaining the

3    hundreds of permits and approvals *from multiple agencies* that are necessary conditions to starting the

4    project.  *Knaster Dec.*, ¶ 11.  HYH *could not* meet those conditions within at least a year after starting,

5    and probably not for one and one-half years, at least.  *Id.*  RSJOC has plenty of time to have its

6    Referendum voted on before the project starts.  The only uncertainty is whether the petition that

7    qualifies the Referendum for whatever ballot on which it will appear has to be in English alone, or

8    Spanish as well.  Delay in holding the Referendum does not, in and of itself, constitute irreparable harm,

9    especially where there is no proper showing of adverse effects on the moving party.

10                    **2.    The Butterfly Village Proponent Cannot Use The Stay To Start The Project.**

11           RSJOC also raise the specter of the County using the stay on the Referendum to its advantage by

12    allowing Butterfly Village to proceed during the stay.  *See RSJOC MPA*, at 10:25-28 ("The County

13    *evidently* takes the position that because the Board deemed the petitions to be invalid and withdrew the

14    Referendum from the ballot, Resolution No. 05-305 is no longer suspended and has now taken effect.

15    Likewise, the property owner … *may* assert that it has obtained vested rights to develop the property …

16    etc") (emphasis added).  Such claims are without evidentiary support, and there are practical and legal

17    reasons why they have no merit.

18           First, the County has no bias in this matter, and it has no axe to grind with RSJOC, HYH, or

19    anyone else.  As noted above, the County is legally obligated to adopt some kind of specific plan to

20    satisfy the requirements of the Superior Court's 2001 Order.  It has been defending its actions with

21    respect to the project for years, at enormous cost to Monterey's taxpayers, against attacks from not only

22    HYH, but RSJOC *et al.* as well.  If the County makes one wrong step in this matter it will face litigation

23    with whatever party is aggrieved.  To suggest that under these circumstances the County is going to pull

24    a fast one during the stay and allow HYH to turn dirt by stealth is ludicrous and incendiary, given the

25    almost guaranteed litigation that would ensue.

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**3.    HYH's Right To Develop Butterfly Village Has Not Vested, And Will Not Vest Before The Referendum Issue Is Resolved.**

In general, no vested right accrues unless the developer (1) has obtained a building permit, (2) performed substantial work, and (3) incurred substantial liabilities (4) in good faith reliance upon the permit. *Avco Community Developers, Inc. v. South Coast Reg'l Comm'n*, 17 Cal.3d 785, 791 (1976).

Even if Resolution 05-305 is seen as having already amended the County's plans and zoning ordinances, the rule remains that no vested right may be claimed based upon existing zoning. *See Gilliland v. County of Los Angeles*, 126 Cal.App.3d 610, 617 (1981). HYH's claim for vested rights, if any, may be based solely upon the development agreement it has entered into with the County, and the vesting tentative map it has obtained. *See* Gov. Code § § 65864 *et seq.*; Gov. Code § 66498.1 *et seq.* The development agreement and tentative map are unaffected by the Referendum. In any event, under the Permit Streamlining Act (Gov. Code § 65920 et seq.), HYH may be said to have acquired vested rights under these statutory provisions only to the extent of the County's power to apply laws and regulations to the approved project, and that power is limited to the law and regulations in effect at the time the development agreement was executed, and those in effect at the time the application for vesting tentative map was deemed complete by the County. Ultimately, therefore, under the foregoing statutory provisions HYH's vested right to develop the project depends upon the results of the Referendum. *See, e.g., Midway Orchards v. County of Butte*, 220 Cal.App.3d 765 (1990) (development agreement held invalid because general plan amendment relied on for consistency was timely referended).

Until this Referendum is either obliterated for good by the courts or voted down by the electorate if allowed to be placed on the ballot, any claim of vested rights is premature. HYH has to comply with a total of 263 conditions of approval, a substantial number of which would require a long time to satisfy. Thus, HYH's ability to pour concrete, so to speak, and proceed with the project while the Referendum matter is pending is remote, at best.[4]

--------------------------------------------

[4] The timing of this Motion strongly suggests the lack of potential for irreparable harm, and in fact that plaintiffs' are seeking to involve this Court in political maneuvering. All of the conditions for this injunction motion have existed since April 20th, when the Order granting a hearing *en banc* in *Padilla* was issued. Judge Collins issued her ruling in *Chincay v. Verjil* on April 19th. *Woocher Dec.*, Ex. A. Yet plaintiffs did not act for almost three months, suggesting no great fear that the Butterfly Village Project will commence in the meantime. At the telephone hearing between the parties and the court,

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**4.      RSJOC Should Have And Could Have, But Did Not, Move For An Injunction In Its Superior Court Writ Of Mandate Action.**

As discussed above, Landwatch and RSJOC sued the County, in Monterey Superior Court action noa. M 72790 and M 77363, seeking Writs of Mandate challenging the County's approval of the Butterfly Village project. *Knaster Dec.*, ¶ 5, Exs. D, E. *Id.*  HYH is the real party in interest in that proceeding.  Landwatch and RSJOC are also cross-defendants in HYH's pending takings case against the County, in Monterey Superior Court action no. M 46616.  Those two cases provide RSJOC with two forums in which to enjoin the project from proceeding, and indeed are the proper forums for the relief that RSJOC seeks. *See, e.g.*, Cal.Code.Civ.Proc. §1094.5.  But they have chosen neither forum for the relief they seek.

If RSJOC were genuinely concerned that the removal of the Referendum from the ballot possibly gave new life retroactively to Resolution 05-305, the Superior Court could almost certainly have acted to clarify at least that question.  All of the parties with interests in the project are already before those courts.  RSJOC's decision to force the County to conduct the Referendum ballot in an entirely new lawsuit suggests its own lack of belief that it faced a threat of irreparable harm.

RSJOC may respond that it in fact sought a writ of mandate in the Superior Court to force the Referendum election, but that the County removed the action to this Court.  However, the crucial fact is that it did so in an entirely new Superior Court proceeding, and chose not to do so in either of the actions in which it was already a party, and where the Superior Court had the appropriate jurisdiction, knowledge and expertise.  This Court should not ignore the significance of this fact, and the implicit inference that RSJOC is attempting to take advantage of the temporary uncertainty in this Circuit surrounding *Padilla* to force an early election that is just not necessary.  This is pure politics, and RSJOC faces no potential irreparable harm that should force this Court to get involved.

---

plaintiffs' counsel advised that he had waited so that he could attend the *Padilla en banc* hearing, presumably to learn of the en banc panel's *leanings*.  Having availed themselves of that experience, RSJOC would now deny this Court the benefit of the en banc panel's actual *ruling*.

**5.      The Ninth Circuit Has Already Indicated That It Would Deny The Injunction That RSJOC Seeks.**

The Ninth Circuit has already effectively provided guidance to this Court on the preliminary injunction issue.  After this Court's ruling on the *In re County of Monterey Initiative Matter* the losing plaintiffs appealed, and sought an emergency injunction pending appeal from the Ninth Circuit to force the Initiative on to the next ballot.  *See* Declaration Of Ciarán O'Sullivan In Opposition To Motion For Preliminary Injunction ("O'Sullivan Dec."), ¶ 2, Ex. A.  The same arguments presented here as to irreparable harm to the plaintiffs if the Referendum is not placed on the next ballot were made there in the context of an initiative.  *See Id.*  The factual circumstances were also identical, in that in part the Initiative concerned the same land use issues (and even the same development) as the Referendum, and the Ninth Circuit was also aware that a ruling was pending that would affect the status of *Padilla* as good law in this Circuit, and hence the applicability of the FVRA to petitions.  *See Id.* at ¶ 3, Ex. B.  In that case the pending ruling concerned *whether* the case would be heard *en banc*, and in this case the pending ruling is that of the *en banc* panel itself.  *Id.*  But the essential point, that guidance would soon be forthcoming from the Ninth Circuit, is identical and equally applicable here.  And if the distinctions that RSJOC make here between the initiative and referendum processes do, in fact, make an important difference to the analysis, the plaintiffs' arguments as to the likelihood of their succeeding on the merits were even stronger in the initiative matter.  But the Circuit *denied* the request for relief, ordered the appeal stayed pending the Circuit's *en banc* ruling in *Padilla, and did not order the initiative back on the ballot.*  Thus, in almost identical circumstances the Ninth Circuit was not persuaded by the plaintiffs' assertions of irreparable harm.  The proper course here too, which is the less risky option for all parties, is to stay resolution of this referendum petition case until the *Padilla* panel ruling provides guidance.

**6.      The Minority Voters Of Monterey County, The County Itself, And All Of The Taxpayers Of The County, May Suffer Irreparable And Unnecessary Harm If The Court Changes The Status Quo.**

In contrast to the utter lack of irreparable harm to RSJOC if the injunction is denied, the County and its minority voters will indeed be harmed, and unnecessarily so, by granting an injunction.

Firstly, the County will incur the additional expense, estimated by the Acting Registrar as being approximately $50,000, of putting the additional measure on the upcoming November ballot.  That cost may ultimately prove to have been unnecessary, depending on the *en banc* panel ruling.  Although a

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   later special election will cost more, that expense *would only be incurred when and if the Referendum is*

2   *known to be valid*, whereas RSJOC asks the County to incur the $50,000 based on the mere possibility

3   that it will be spent on a valid referendum.  No exigency exists under these facts to compel this kind of

4   gambling with the taxpayers money.

5        Furthermore, the $50,000 is but the tip of the iceberg in terms of the expenses that the County

6   and its citizens would have to incur.  The County will incur the legal expenses associated with resuming

7   its declaratory relief proceeding in one of the state court actions, wherein the County seeks clarification

8   from the court as to the priority between the state court Order and this Referendum overturning the

9   legislation required by that Order.  That issue will undoubtedly be hard-fought and expensive, an

10  unnecessary expense if the Referendum was not brought legally to the ballot.[5]

11       It is also a given that there will be considerable campaigning for and against the Referendum if it

12  is placed on the ballot, with the associated expenses of such activities.  The County, too, will incur

13  expenses of an informational nature during the campaign.  Again, those expenses will turn out to have

14  been wasted if the Referendum petition process is found to be invalid, a fact which seems to concern

15  RSJOC not one iota.  Although not quantifiable monetarily, this also means a divisive and confusing

16  election for the voters, when no-one can guarantee whether it is legal or not.

17       Additionally, the rights of Monterey minority voters will be irreparably harmed.  In the First

18  Amendment context the right to vote is inextricably tied to the right to petition, and petition signatures

19  are treated the same as votes for constitutional purposes.  *See Green v. City of Tucson,* 340 F.3d 891,

20  893 (9th Cir. 2003); *see also Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 186 (1999)

21  (noting that under First Amendment, petition circulation "is core political speech because it involves

22  interactive communication concerning political change" (internal quotations omitted)); *Meyer v. Grant,*

23  486 U.S. 414, 421 (1988) ("The circulation of an initiative petition of necessity involves both the

24  expression of a desire for political change and a discussion of the merits of the proposed change).

25  

26  [5] It serves as a reminder too that regardless of the ruling on this Motion, the Referendum's ability to
    effect its stated goal, repealing Resolution No. 05-305, is not a foregone conclusion even if passed.  It is

27  the County's view, based on the applicable law, that should the voters pass this Referendum their actions
    would be ultra vires in that they would be purporting to enact legislation that the Board itself could not

28  have passed in light of the state court Order.  *Knaster Dec.*, Ex. H (County's MPA).  That fact provides
    a further reason why RSJOC will not prevail on the merits at trial of this action.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    Spanish-speakers in Monterey who could not read or understand English were necessarily bypassed by

2    signature-gatherers, thereby being deprived of their constitutional right to express their desire, if they

3    had one, to repeal the Resolution.  The fact that the Referendum petition was not circulated in Spanish

4    also increases the possibility that unscrupulous signature-gatherers, who are usually paid according to

5    the quantity of signatures gathered, will misrepresent the contents of the petition to minority voters.  As

6    importantly, such Spanish-speakers were effectively shut out from awareness of the referendum

7    campaign's goals, thereby also depriving them of the opportunity to mount opposition to the signature-

8    gathering, or to participate in the electoral process generally.

9              "Hispanic Voters denied equal access to the federal process cannot
              collect damages after trial for denial of the right to vote (See
10             *Casarez v. Val Verde County* (W.D. Texas 1997) 957 F.Supp. 847,
              864-65 [granting preliminary injunction because monetary
11             damages could not redress Voting Rights Act violations].)
              Moreover, denial of equal access to the electoral process
12             discourages future participation by voters. (*See, e.g. Gomez v. City
              of Watsonville* (9th Cir. 1988) 863 F.2d 1407, 1416, n. 4
13             [discussing how voting discrimination may result in depressed
              voter registration].)."

14   *See, e.g. United States v. Berks County*, 250 F.Supp.2d 525, 540-41 (E.D. Pa. 2003).

15             This denial of those voters' First Amendment rights by violating the FVRA constitutes

16   irreparable injury.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment

17   freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury"); *Badillo v.*

18   *Stockton*, 1988 U.S. Dist. Lexis 17601 at p. 24 (E.D.Cal. 1988) (a violation of the FVRA "implicates a

19   fundamental constitutional right that tips the balance of relative hardships in plaintiffs' favor.  The loss

20   of a fundamental constitutional right even for a short period of time is, per se, an irreparable harm...").

21             Plaintiffs make the perverse argument that rejection of their defective referendum petition

22   irreparably harmed the 15,000 petition signers who would be deprived "of their First Amendment right

23   to petition their government and to have a meaningful say on one of the most important land-use and

24   quality-of-life issues facing their community."  *See RSJOC's MPA*, at 17:21-23.  But the injunction is an

25   equitable remedy, and one seeking equitable relief should have clean hands.  *See* 13 Coquillette, D. et

26   al., *Moore's Federal Practice*, § 65.06[5] n. 23 (equitable relief denied if plaintiff acted in bad faith).  If

27   indeed RSJOC's First Amendment rights may be somehow infringed upon by not putting this

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1 constitutionally defective Referendum on the ballot, consideration of that harm must take second place

2 to consideration of the harm imposed by RSJOC on Monterey's minority voters.

3   In dismissing the implications for minority voters of a holding that the Act does not apply to

4 petitions, RSJOC also argues that the fact that the Board could just instead repeal the ordinance without

5 putting it on the ballot supports the claim that the petition is not related to the election. *See RSJOC's*

6 *MPA*, at 12:10-14. But, on the contrary, that fact underscores the importance of minority participation in

7 the petition process: if they are excluded from the petition process *and* there is subsequently no election

8 on the matter, then they have irrevocably been excluded from the entire process of political change,

9 which flies in the face of Congress' purpose in enacting FVRA. *See* 42 U.S.C. § 1973aa-1a(a)

10 (discussed in III.C.1, below). RSJOC's claims are surely a perversion of Congress' intent.

11   Monetary damages cannot compensate these voters for these losses. The unnecessary expenses

12 that the County would incur would also not be recoverable from any party. Given that RSJOC *et al* will

13 suffer no harm by a delay, it is plain that the balance of hardships tips in favor of the defendants here,

14 and the motion must be denied. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545-546

15 (1987) (injunctive relief is denied if balance of hardships favors non-movant).

16   **C. The Likelihood That RSJOC Will Succeed On The Merits Is Entirely Speculative.**

17    **1. Section 203 Of The FVRA Must Be Broadly Construed To Require**
    **Translation Of A Referendum Petition Into Spanish In Monterey.**

18

19 FVRA § 203 states:

20    Whenever any State or political subdivision subject to the
prohibition of subsection (b) of this section provides any
registration or voting notices, form, instructions, assistance, or
21    other materials or information relating to the electoral process,
including ballots, it shall provide them in the language of the
22    applicable minority group as well as in the English language.

23 42 U.S.C. § 1973aa-1a(c).

24   Under the applicable federal regulations, the County is "subject to the prohibition of subsection

25 (b)." 28 C.F.R. § 55, App. (2005) (identifying the County as being subject to the multilingual

26 requirements of § 203, and in particular the Spanish heritage requirements). The obligations thereby

27 imposed on counties such as Monterey are further expounded in the regulations as follows:

28    The requirements of ... 203 (c) apply with regard to the provision
of "any registration or voting notices, forms, instructions,
assistance or other materials or information relating to the electoral

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

process, including ballots." … Accordingly, the quoted language should be broadly construed to apply to all stages of the electoral process, from voter registration through activities related to conducting elections, including the issuance, at any time during the year, of notifications, announcements, or other informational materials concerning the opportunity to register, the deadline for voter registration, the time, places and subject matters of elections, and the absentee voting process.

28 C.F.R. 55.15. Pursuant to these provisions, "other materials" should be conveyed in Spanish, in addition to English, so that all the electorate may participate effectively in the process.

Supreme Court precedent mandates that this Court broadly construe the FVRA. *See Allen v. State Bd. Of Elections*, 393 U.S. 544, 565-66 (1969) (the Act gives a broad interpretation to the right to vote and recognizing that voting includes "all action necessary to make a vote effective"). In enacting the bilingual election requirements, Congress made an explicit finding that "language minorities had been effectively excluded from participation in the electoral process," necessitating remedial action "to enforce the guarantees of the 14th and 15th amendments." 42 U.S.C. § 1973aa-1a(a). This authority requires a broad view of the applicability of the FVRA to state elections. Applying the FVRA's bilingual mandates to referendum petitions will further Congress' goal of ensuring broad participation in the electoral process.

### 2. Referendum Petitions, Forms And Associated Documents Constitute "Materials Or Information Relating To The Electoral Process."

#### a) A plain reading of section 203 requires that referendum petitions, forms and associated documents constitute "materials or information relating to the electoral process."

The plain meaning of a statute controls absent a clearly expressed legislative intention to the contrary. *See Lopez v. Monterey* County, 525 U.S. 266 (1999) (interpreting Section 5 of the FVRA by examining the "face of the Act itself"); *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999) (courts will look no further than the plain meaning of the statute unless application leads to unreasonable or impractical results); *see, also White v. E-Loan, Inc.*, 409 F.Supp.2d 1183, 1186 (N.D. Cal. 2006) ("It is only appropriate for this Court to consider plaintiff's legislative history arguments if the statutory text is ambiguous").

The language of section 203 includes, in pertinent part, the following: "whenever any … political subdivision …provides any registration or voting notices, *forms*, instructions, assistance, *or other*

1   *materials or information relating to the electoral process*, including ballots, it shall include them in the

2   language of the applicable minority …" 41 U.S.C. § 1973aa-1a(c) (emphasis added).  In other words,

3   the Act sets up a two-prong test to determine its applicability: (1) the political subdivision must

4   "provide" the material (see discussion below), and (2) the material must be either a notice, form,

5   instructions, assistance or "other materials or information relating to the electoral process."

6        A "form" is a "printed or typed document with blank spaces for insertion of required or

7   requested specific information."  *See Merriam Webster's Collegiate Dictionary*, at 458 (10th ed. 1996).

8   Referendum petition documents easily fit that description.  *See, e.g.,* Cal. Elec. Code § 9147(a) ("The

9   heading of a proposed referendum measure shall be in substantially the following *form*: 'Referendum

10  Against an Ordinance Provided by the Board of Supervisors'") (emphasis added).

11       Additionally, the statutes require that referendum proponents attach a copy of the ordinance to be

12  referended to the above-referenced form.  *See Id.,* § 9147(b).  There can be no serious dispute that the

13  ordinance being referended constitutes "other materials or information relating to the electoral process."

14  It is the very reason for the election.

15       All of RSJOC's arguments on this point hinge on its contention that circulation of the petition

16  has nothing to do with the "election," for the simple reason that it occurs before the balloting.  *RSJOC's*

17  *MPA*, at 11-12.  While that was arguably the view of other circuits in two cases upon which RSJOC

18  relies (*Delgado  v. Smith*, 861 F.2d 1489 (11th Cir. 1988); *Montero v. Meyer*, 861 F.2d 603 (10th Cir.

19  1988)), other precedent and authority is contrary.  The United States Attorney General rejects this view,

20  explicitly finding that *petitions* are included. See 28 C.F.R. § 55.19(a) (discussed below).  Most

21  important the Ninth Circuit summarily rejected that argument: "[t]he Act does not exempt information

22  or material, compelled by statute, which is preliminary to voting, but essential if an election is to occur."

23  *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 833, n. 11 (9th Cir. 1986) (reversing district court's

24  finding that plaintiffs' Voting Rights Act claim was frivolous under Rule 11).  Nothing is more essential

25  to an election referendum occurring than qualifying that referendum for the ballot in the first place.  And

26  that qualification cannot occur if the form prescribed by statute is not circulated, and the ordinance to be

27  repealed is not attached.  Axiomatically, the form and the ordinance constitute "information or materials

28  related to an election."

1    RSJOC essentially argues that the only material covered by section 203 are those documents that

2    are provided to voters at the polling booth, namely ballots. *RSJOC MPA*, at p. 12-14. Such an

3    interpretation violates all rules of statutory construction: it would render the phrase "including ballots"

4    superfluous; it would also render the phrase "other materials or information relating to the electoral

5    process" both superfluous *and* redundant. Because of section 203's broad remedial scope, the statute

6    must be construed to include materials other than simply the ballots themselves. If Congress had

7    intended RSJOC's interpretation, it could have easily restricted the act's application to just balloting.

8    Instead it chose the broader term "relating to the electoral process," which includes all precursor steps,

9    and which clearly includes materials such as petitions that are circulated to the voters.

10                    b)        **The legislative history of section 203 supports this conclusion.**

11    The legislative history of the FVRA mandates a broader interpretation than RSJOC

12    acknowledges. For example, in its report on the bilingual amendment, the Senate specifically expressed

13    concern that language minorities exerted little influence or "control over the election" or appointment of

14    local officials due to language barriers. S. Rep. No. 94-295 (1975). It strains reason to suggest that

15    persons who initiate or sign referendum petitions are not participating in the "electoral process" or are

16    not exercising some "control over [an] election."

17    RSJOC asserts that the same legislative history limits the application of the act only to

18    "elections," and not the process of the election, because of the frequent use of the term "elections,"

19    "voting" and "ballots" in the record. But RSJOC's argument assumes the result it argues for: *i.e.*, that

20    such terms relate only to the final act in the process, the turning of the voting-machine lever. As

21    demonstrated above, that is incorrect. Further, RSJOC's focus on the Congressional discussion of

22    "elections" in the VRA's legislative history does not preclude this Court from finding that Congress was

23    also concerned with ensuring that all phases of the electoral process become inclusive of language

24    minorities. After all, Congress specifically recognized that "language minority citizens for the most part

25    [had] not successfully challenged white political domination." S. Rep. No. 94-295 (1975). Such

26    passages in the legislative history clarify the breadth of Congress' objectives in passing the bilingual

27    requirements.

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

On this point, RSJOC argues that Congress has implicitly acquiesced in an interpretation of the act that considers the electoral process to be limited to the act of balloting, because when it reauthorized the act in 1992 it allegedly acquiesced in the *Delgado v. Smith*, 86 F.2d 1489 (11th Cir. 1988) and *Montero v. Meyer*, 861 F.2d 603 (10th Cir. 1988), two decisions from other circuits that held that section 203 did not apply to recall petitions under the entirely different statutory frameworks existing in Florida and Colorado, respectively. *See RSJOC's MPA*, 15:3-16, and fn. 6. Such acquiescence is supposedly based on the fact that Congress did not amend the act to overrule those decisions. But, the Court should also note that Congress has revisited the act twice (in 1982 and 1992) since the AG's regulations were issued shortly after the act's passage in 1975, and also acquiesced in the AG's interpretations of the act as applying to <u>petitions</u> of all kinds (see below). Cf. *Pleasant Grove v. United States*, 479 U.S. 462, 468 (1987) (awareness of AG view on the scope of section 5 of the same act).

### c)    Deference should be accorded to the United States Attorney General's Interpretation of Section 203(c).

The Attorney General's ("AG") reasonable interpretation of the statute must be accorded deference. *See United States v. Sheffield Bd. Of Comm'rs*, 435 U.S. 110, 131-32 (1978) (recognizing that because of the AG's "key role" in the formulation of the FVRA the United States Supreme Court has "given great deference to his interpretations" of the statute).

The AG's guidelines regarding section 203 provide in pertinent part as follows:

> (a) Types of materials. … A jurisdiction required to provide minority language materials is only required to publish in the language of the applicable minority group materials distributed to or provided for the use of the electorate generally. Such materials, for example, ballots, sample ballots, informational materials, and *petitions*.

28 C.F.R. 55.19(a) (emphasis added). Not only does this explicitly cover *petitions*, but it provides that any material "distributed to or provided for the use of the electorate generally" is also covered. Any petition is by definition distributed to the *electorate* generally, because it can only be signed by registered voters of the jurisdiction. *See* Cal. Elec. Code § 9144.

Moreover, the regulations elsewhere evidence the AG's interpretation of section 203 as applying to materials and activities other than merely casting the ballot.

> The basic purpose of these requirements is to allow members of applicable language minority groups to be effectively informed of and participate effectively in *voting-connected* activities.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

> Accordingly, the quoted language should be broadly construed to apply to *all stages of the electoral process*, from voter registration through activities related to conducted elections, including, for example the issuance, at any time during the year, of notifications, announcements, or other informational materials concerning the opportunity to register, the deadline for voter registration, the time, places and subject matters of elections, and the absentee voting process.

29 C.F.R. § 55.15.  This statement of purpose clearly does not, as RSJOC would argue, evince a desire to impose any temporally-based restrictions on the application of the act.

Finally, RSJOC asserts that the fact that the AG has not sued any government that has allowed single-language petitions in covered jurisdictions is persuasive.  But RSJOC has provided no evidence, and the County knows of none, that the AG has ever formally approved the circulation of such petitions, or intervened in any action to support the contention that they were not covered.  The AG's lack of action does not support RSJOC's position.  In summary, the AG, which played a key role in the formulation of the Act, clearly construes Section 203 to cover all kinds of petitions, Congress has acquiesced in that construction, and this Court should accord that construction great deference.

### d)   Ninth Circuit precedent requires that section 203 applies to petitions.

The Ninth Circuit's discussion of Section 203(c) and the recall process in *Zaldivar, supra*, 780 F.2d 823, is instructive and represents an interpretation that is consistent with both the broad scope of the Voting Rights Act and the guidelines promulgated by the United States Attorney General.

In *Zaldivar*, the court was required to decide whether a claim that section 203 covered recall petition circulation was frivolous within the meaning of F.R.C.P. Rule 11.  The court acknowledged that "the purpose of the bilingual provisions of the Act is to end the language disability of some citizens to full participation in the electoral process; and to this end, the Act requires information *relating to* the electoral process to be brought to their attention in both English and the minority language." *Id.* at 833 (emphasis added).  The court also reiterated that voters "literate only in Spanish would be deprived of the same opportunity as voters literate in English of considering the written arguments for and against the recall of their councilman prior to considering signing a recall petition if the [Voting Rights Act] were held not to apply." *Id.*  Finally, the court dismissed as without merit defendants' argument that "a recall notice is only a preliminary step to voting and therefore is unaffected by the bilingual provisions

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   of the Act," stating that "[t]he Act does not exempt information or material, compelled by statute, which

2   is preliminary to voting, but essential if an election is to occur." *Id.* at 833, n. 11.

3      Although concededly dictum, the appellate court's conclusion is unmistakable: materials for pre-

4   recall steps, such as petitions, are covered materials under Section 203( c). Furthermore, it is precedent

5   for this Court in this preliminary injunction proceeding. In *United States v. Johnson*, 256 F.3d 895, 914

6   (9th Cir. 2001) (per curiam), the court stated that "where a panel confronts an issue germane to the

7   eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that

8   ruling becomes the law of the circuit." *See also Spears v. Stewart*, 283 F.3d 992, 1005, 1007 (9th Cir.

9   2002) (Kozinski, J. concurring) (when panel deliberately and purposefully addresses an issue presented

10  by parties, it obtains precedential force). The Ninth Circuit in *Zaldivar* confronted the issue presented

11  here, whether materials presented to petition signers prior to balloting occurring were related to an

12  election. It ruled that section 203 is applicable to "information or material, compelled by statute, which

13  is preliminary to voting, but essential if an election is to occur," and that is now the law of the Circuit.

14  Section 203, therefore, also applies to the referendum petition circulated here.

15      **3. The Referendum Petition And Associated Forms Are "Provided By" The State.**

16

17     Under the California electoral system the State "provides" the referendum petitions so as to

18  require their translation under FVRA. The argument that referendum petitions are privately circulated

19  and drafted and therefore not covered materials under Section 203(c) ignores the tight control – and the

20  reasons for that control – that the State of California and Monterey Registrar exert over virtually every

21  aspect of the referendum process. The state plays an integral role in regulating, approving, monitoring,

22  and, ultimately, in administering referendum elections. *Zaldivar*, supra, 780 F.2d at 833 ("That the state

23  or a political subdivision has mandated by law that certain preliminary steps be taken by the would-be

24  voter, the candidate for office, or the proponents of an issue does not in any sense absolve the

25  governmental entity of its responsibility under the Voting Rights Act"). Indeed, this heightened level of

26  control that extends to the beginning of every referendum process is enshrined in the numerous statutory

27  requirements governing conduct, well before the point where petition signatures are certified. *See Cal.*

28  *Elec. Code § § 9140 et seq.; see also Id.* at § 9146 (the provisions of the elections code relating to the

1 │ form of petitions, the duties of county elections officials, and the manner of holding elections in

2 │ *initiative* matters also govern the procedures in *referendum* matters).

3 │      As discussed above, the state mandates the specific format that county referendum petition

4 │ proponents are required to use. *See* Cal. Elec. Code § 9147(a) ("The heading of the proposed

5 │ referendum shall be in substantially the following form: 'Referendum Against an Ordinance Provided by

6 │ the Board of Supervisors'"). The Code also requires that a copy of the title and text of the ordinance

7 │ being referended be attached to the petition. *Id.*, § 9147(b). It is beyond dispute that the attached

8 │ *ordinance*, in that it was drafted and adopted by the Board of Supervisors in the first place, is provided

9 │ by the state. Since the ordinance becomes a part of the petition, the petition too is provided by the state.

10 │      That the state provides the referendum materials within the meaning of FVRA is further

11 │ evidenced by the large role the political subdivision plays in ensuring that referendum petition conforms

12 │ to statutory requirements. In addition to the above-referenced code sections specifying the form and

13 │ content of the referendum petition, the code imposes highly specific requirements as to the information

14 │ required of petition signers. *Id.* at § 9020 (incorporated into the referendum petition process by sections

15 │ 9101 and 9146). It imposes time limits on when the petition may be filed in order to halt effectiveness

16 │ of the relevant ordinance. *Id.* at § 9141, 9144 (ordinances become effective 30 days after passage

17 │ unless a referendum petition protesting its adoption becomes effective). The local elections officer, in

18 │ this case the Registrar of Voters, is required by the Code to examine and verify the number of valid

19 │ signatures on the petition, and is provided with detailed direction on how to do so. *Id.* at § § 9113-9115.

20 │ The political subdivision may have to reject the petition if it does not comply with the Code. *See, e.g.*

21 │ *Myers v. Patterson*, 196 Cal.App.3d 130, 136 (1987) (regarding initiative petition). When and if a

22 │ referendum petition qualifies for the ballot, the Registrar is required to forward the measure to the

23 │ County Counsel for preparation of an impartial analysis of the measure and its effect on existing law,

24 │ and if necessary the county auditor may be required for a similar analysis of the fiscal effect of the

25 │ ordinance. *Id.* at § 9160.

26 │      That citizens may technically print or type their own forms is irrelevant: private persons may

27 │ print the forms, but only if they abide by the format, content, and style rules set forth in the Elections

28 │

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  Code. The state's authority and obligation to review and then approve or reject referendum petitions that

2  do not abide by Code requirements adds to the evidence of government control.

3       This tight control serves an important informational function. California places a high premium

4  on the value of ensuring that voters and potential referendum petition signers have unfettered,

5  unobstructed access to information about the ordinance sought to be repealed. These code provisions

6  recognize the uncertainty of relying on oral explanations by petition circulators, as well as the inherent

7  one-sidedness of the signature-gathering process. Language-minority voters miss out entirely on these

8  state-mandated electoral protections when the petitions are not provided in covered languages.

9       In sum, about the only acts involved in the referendum petition process that the state does not

10  perform or dictate are the copying and circulation of the petition; but, as noted above, the state carefully

11  regulates the latter as well. It is difficult to imagine greater state involvement in an election-related

12  process.

13            **a)    Judge Collins' Decision does not provide guidance here.**

14       The County is aware of Judge Collins' decision in another case. *See RSJOC's MPA*, at 7:18-22.

15  For the reasons stated above, the County respectfully disagrees with Judge Collins' conclusions. In the

16  County's view, the *quantity* of state involvement in the process is not as significant as the fact that there

17  is at least some involvement. Judge Collins' decision acknowledged state involvement in the

18  referendum process, but found it "limited." *See Woocher Dec.*, Ex. A, at 15:14-161. Furthermore, an

19  examination of Judge Collins' ruling suggests that some of the arguments made by the County here were

20  not made to the court in that proceeding. Most important, Judge Collins was required to render her

21  decision in the context of a request to *remove* two referenda *from* the ballot, whereas here the Court is

22  being asked to *force* a referendum *onto* the ballot. Needless to say, those two diametrically opposed

23  actions will have completely different implications for the balancing of hardships that a Court must

24  perform with respect to a mandatory injunction, and hence the ruling in *Chinchay v. Verjil* is not helpful.

25  **IV.   CONCLUSION**

26       The County cannot deny that there are colorable arguments supporting RSJOC's interpretation of

27  Section 203 as not applying to petitions. The Ninth Circuit is considering them as we speak. But those

28  arguments are based on the decisions of other circuits, interpreting electoral schemes entirely different to

1  California's. There are powerful arguments to the contrary. *Zaldivar* is a decision of this Circuit, has

2  precedential force in the district courts of California, and is supported by the interpretation of the United

3  States Attorney General. *Zaldivar* and the AG's interpretation are in accord with the broad remedial

4  purpose of the FVRA, which is to ensure minority participation in all phases of voter participation in

5  government, including the circulation of petitions. The County and Rangel have strong arguments here,

6  and the likelihood of RSJOC prevailing on the merits is speculative at best.

7       The Court should not issue a mandatory injunction altering the status quo in these circumstances,

8  especially where RSJOC can demonstrate absolutely no irreparable harm by the denial of the injunction.

9  By contrast the County and the minority voters of the County may well suffer irreparable harm by a

10  forced election now: The County will incur the expense of placing a possibly defective measure on the

11  ballot, and many parties will incur the expense of campaigning for and against a divisive measure, the

12  validity of which is uncertain. The harm to Spanish-language voters, is of course, difficult to quantify,

13  but what is certain is that they will have been deprived of the *opportunity* to participate in a matter of

14  public importance in the County.

15       In light of the authorities presented above, RSJOC understandably fears an adverse ruling from

16  the *Padilla en banc* panel, and wants to get its referendum on the ballot before that ruling is known.

17  This Court should not be coerced into playing along with RSJOC's political maneuverings, and should

18  deny the requested change to the status quo.

19

20  Dated: July 10, 2006                    NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
                                            STEPHEN N. ROBERTS
21                                          NICOLE A. TUTT
                                            CIARAN O'SULLIVAN
22
                                                      / S /
23                                          By: _____
                                                   STEPHEN N. ROBERTS
24
                                            Attorneys for Defendants/Respondents
25                                          BOARD OF SUPERVISORS OF THE COUNTY OF
                                            MONTEREY; TONY ANCHUNDO, IN HIS CAPACITY AS
26                                          MONTEREY COUNTY REGISTRAR OF VOTERS; AND
                                            THE COUNTY OF MONTEREY
27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**